**\*NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

———————————————————  :
THERESA M. ELLIS and SCOTT A.        :
ZUKOWSKI, w/h,                       :
                                :    Civil Action No. 05-726(FLW)
        Plaintiffs,                 :
                                  :    **OPINION**
        v.                           :
                                  :
ETHICON, INC., JOHNSON &             :
JOHNSON, INC., and JOHN DOE(S)       :
                                  :
        Defendants.                 :
———————————————————  :

**WOLFSON, District Judge**:

      Plaintiffs, Theresa M. Ellis ("Ellis" or "Plaintiff") and Scott A. Zukowski, wife and husband respectively, filed suit against Defendants, Ethicon, Inc. ("Ethicon" or "Defendant"), Johnson & Johnson ("J&J"), asserting claims arising under the Americans with Disabilities Act ("ADA") and other state common law claims.[1]  Specifically, Ellis alleges race and disability discrimination claims for failure to accommodate; retaliation; and a breach of contract claim based upon the polices and procedures and customary practices of Ethicon.  Zukowski also pled a lack-of-consortium claim.  After the commencement of the litigation, Zukowski withdrew his claim and Ellis' claim of race discrimination was also voluntarily dismissed (Counts V, VI and IX of the Complaint).  In the instant matter, Defendants move for summary judgment on all counts, and Ellis moves for partial summary

———————————

      [1]Plaintiff has not named any other parties other than Ethicon and J&J as defendants.  As a result, the John Does are dismissed.

judgment on the issue of whether she is "disabled" within the definition of the ADA and whether Ethicon engaged in the interactive process.  For the reasons set forth herein, summary judgment is denied as to all parties with respect to Plaintiff's failure to accommodate claim under the ADA; specifically, the issue of whether Ellis is "actually disabled" pursuant to the ADA.  However, the Court finds that Ethicon failed to engage in the interactive process. In addition, summary judgment is granted to J&J because Plaintiff failed to exhaust her administrative remedies with respect to her claims against J&J. Summary judgment is also granted to Ethicon on Plaintiff's breach of contract claim, breach of implied covenant of good faith and fair dealing claim and retaliation claim.

## BACKGROUND

Plaintiff Ellis comes from a stellar academic background, having received her B.S. in industrial engineering from Stanford University.  She began employment with defendant Ethicon, a J&J company, in September 1997 as a Senior Quality Assurance Engineer. Defendants' Statement of Uncontested Facts ("Defendants' Statements") at ¶ 1.  In January 1999, Plaintiff was involved in an automobile accident on her way to work.  Id. at ¶ 7. Immediately after the accident, Ellis complained of dizziness and consistent pain on the right side of her body.  Id. at ¶ 8.  She was diagnosed with cervical strain and placed on disability by her doctor as of January 7, 1999. Id.; see Dr. Fracis DeLuca's Letter dated April 13, 1999.

On March 29, 1999, Kemper Insurance, the third Party Administrator that managed Ethicon's short term disability ("STD") plan, requested an independent evaluation because of Ellis' continued absence from work.  Defendants' Statements at ¶ 9; Plaintiff's Statement of Uncontested Facts ("Plaintiffs' Statements") at ¶ 9.  Thereafter, on April 13, 1999, Dr.

2

Francis DeLuca, an independent physician assigned by Kemper Insurance, evaluated Ellis and reported that there were no objective medical reasons preventing Ellis from returning to work.  Defendants' Statement at ¶ 9; <u>see</u> Dr. DeLuca's Letter dated April 13, 1999 at p. 3.  Because of Dr. DeLuca's medical findings, Kemper Insurance recommended that Ellis return to work.  Defendants' Statement at ¶ 10.

After receiving notice from Kemper, Ellis contacted her orthopedist, Dr. Evan Reese, who, with the agreement of Dr. Janet Cole, J&J's medical doctor, recommended a gradual return to work plan beginning in June 1999, with three hours per day and no business travel.  Defendants' Statement at ¶ 11; <u>see</u> J&J's Health & Wellness Progress Notes ("Progress Notes") at 4, Encounter 21.  Ellis returned to work on June 2, 1999, with a limited schedule of three hours per day, which would increase to four hours per day on June 16, 1999.  Defendants' Statement at ¶ 13; <u>see</u> J&J's Medical Disposition dated May 28, 1999.  However, on June 17, 1999, because of complaints of pain, Ellis was out of work again.  The following day, Ellis met with Dr. Cole and indicated she was not doing well because of pain from excessive walking.  Progress Notes at p.5, Encounter 25.  Ellis also indicated that she had a hard time concentrating and her right eye's vision was impaired due to pain.  <u>Id.</u>  Due to these complaints, Ellis informed Dr. Cole that her orthopedist did not want her to increase her work schedule to four hours per day as previously planned.  <u>Id.</u>; Plaintiffs' Statements at ¶ 14.  While Dr. Cole agreed to keep her work schedule at three hours per day for the next week or two, on June 25, 1999, Ellis' work schedule was increased to four hours per day, but the travel restrictions were maintained.  Defendants' Statements at ¶¶ 15-16.

On July 7, 1999, Ellis' six month STD plan period ended, and because Ellis had elected to subscribe to Long Term Disability with income replacement, she was not eligible

3

to receive any income replacement if she did not return to work full time.  Ellis would only be paid for any actual time worked.  Defendants' Statements at ¶ 17; see Ellis' Dep. at p.119 (Ellis indicated during her deposition that she didn't understand the terms of the long-term disability plan; she never paid attention to the election on the enrollment form).  On or about July 1, 1999, Ellis presented a revision to an earlier return to work memo in which she devised a plan to phase back into a full-time schedule with no restrictions.  Plaintiffs' Statements at ¶ 18; see Ellis' email to Liz Timmons dated July 1, 1999.  According to Ellis' plan, she would return to work full time as of July 7, 1999, work at home three days a week, and gradually return to work with no restrictions.  Id.  The plan was apparently agreed to by Ms. Timmons, Ethicon's occupational health nurse; however, Ms. Timmons indicated that Dr. Reese would have to provide documentation for the revisions.  Id.

On or about July 6, 1999, Ellis presented Ethicon with a note from Dr. Reese approving her plan.  Plaintiffs' Statements at ¶ 20.  At that time, she was informed that Dr. Cole did not agree with the revisions proposed by Ellis and that she felt Ellis should gradually return to work for six hours a day, but no more.  Progress Notes at p. 5, Encounter 26.  Dr. Cole spoke to Dr. Reese and met in person with Ellis on July, 7 1999, when she returned to work from her leave.  Progress Notes at p. 6, Encounter 27; see Plaintiffs' Statements at ¶¶ 20-21.  Dr. Cole advised Ellis that, despite the approval from Dr. Reese, she would only allow Ellis to return to work for six hours a day with travel restrictions.  Defendants' Statements at ¶¶ 21-22; Progress Notes at p. 6, Encounter 27.  Ellis' manager was made aware of the recommendations to Ellis' work schedule, and he agreed to accommodate them.  Id.  Nevertheless, Ellis felt badgered and afraid because she didn't understand why the changes were made just before she was scheduled to return to work.

4

Ellis' Dep. at p. 17.  Ultimately, on August 2, 1999, Dr. Reese released Ellis for a return to full time duty with travel restrictions; those restrictions were lifted as of September 1, 1999. Progress Notes at p. 7, Encounters 30-31.

Ellis worked without any restrictions or accommodations and without event from September 1999 until September 2000, when she was promoted to Staff Quality Engineer. Compl. at ¶ 14.  In February 2001, Lesley Traver ("Traver") became the Director of Ellis' department.  Traver had not been in Ellis' department or in her management chain of command prior to this time and she had no involvement with Ellis during her 1999 short-term disability period.  Ms. Traver's Dep. at p. 8, 11-12, 86.  Between 200 and 2001, the main and primary focus of the "Corporate Quality Engineering" group was changed to "New Product Development Quality Engineering."  Prior to this change, the role of a quality engineer was to provide routine support to corporate and manufacturing initiatives.  The change in 2001 created an environment where quality engineers, like Ellis, were dedicated to support specific new products in development.  Defendants' Statements at ¶¶ 28-29; Plaintiffs' Statements at ¶¶ 28-29.

In April 2001, on the recommendation of her family doctor, Ellis was seen by a neurologist, Dr. John Mahon, because she was still complaining of dizziness, pain and inability to concentrate.  See Dr. Mahon's Letter dated April 6, 2001.  Dr. Mahon diagnosed Ellis with post concussion syndrome and a mild traumatic brain injury stemming from the 1999 car accident.  Id. at p. 2.  The doctor also referred Ellis to a neuropsychiatrist, Dr. Barbara Watson, for an evaluation.  Id.  Due to the severe post concussion syndrom, Dr. Watson tested Ellis to evaluate her cognitive status, and reported the following:

What is clear . . . from her self-report and performance on this

> evaluation is that cognitive problems compatible with mild traumatic brain injury persist. Mild deficits in high-level problem solving requiring sustained attention, mental flexibility and integrative thinking were noted. On a function level, this deficit corresponds to her complaints of inefficient and slow cognitive processing. High-level attention was stressful and required significant effort, showing impairment on one sensitive test of divided attention to auditory material. Deficits in high level attention often correspond to every day problems with "multi-tasking," Relative areas of weakness were noted in a number of areas. In understanding these relative weaknesses it is important to appreciate that average scores do not necessarily accurately represent Ms. [Ellis'] pre-injury cognitive potential. For her, average is <u>not</u> normal and some of her average scores are judged to represent decline in pre-injury ability . . . Ability to learn new information presented just once was low average, and is also judged to represent a decline in functioning. . . . Declines in word retrieval and reading comprehension, which are low average and average respectively, are also noted and compatible with self-reported post accident changes.

> . . . While Ms. [Ellis'] pain, cognitive fatigue and depression were all controlled and managed in the testing situation, they are likely major contributors to sub-optimal functioning in daily life. Environmental demands also contribute to sub-optimal, inconsistent cognitive functioning. Ms. [Ellis'] work environment, in particular, is not conducive to continued recovery. She wears many "hats" at work, labors in a cubicle with minimal privacy, and must work longer to accomplish what tasks previously performed with less effort. I do not believe it is in her interests, physically, cognitively or emotionally, to continue at the pace she has been working.

<u>See</u> Dr. Watson's Letter to Dr. Mahon dated May 1, 2001 at p. 5. Ultimately, Dr. Watson recommended that Dr. Mahon suggest other work options for Ellis, e.g., "short-term disability, reduction of hours and responsibilities, and/or an accommodated work environment." <u>Id.</u> at p. 6. Based on Dr. Watson's report and Dr. Mahon's recommendation, Ellis began a second period of short-term disability on April 23, 2001. Defendants' Statements at ¶ 36; Plaintiffs' Statements at ¶ 36. She also began cognitive rehabilitation therapy at Good Shepard Hospital in Pennsylvania. <u>See</u> Dr. Mahon's Letter dated April 23, 2001.

On August 30, 2001, Kemper Insurance sent Ellis and her husband an email to inform them that Ellis' six-month STD period would expire on October 21, 2001. Because she had not elected for income-replacement benefits for Long Term Disability, Ellis' income would cease at that time.[2] See Kemper's Letter dated July 23, 2001. Subsequently, Ellis' husband sent an email massage to Kemper stating that Ellis was feeling better, was ready to return to work and would visit Dr. Mahon in mid-September to discuss return to work restrictions. See Zukowski's Email dated August 31, 2001. However, on October 1, 2001, a cognitive therapist from Good Shepard Hospital strongly recommended, inter alia, that Ellis should work from home for a three month period, after which she should slowly transition into the work setting. See Debra Dudeck-Sparta Letter dated October 1, 2001.

On October 2, 2001, Ellis called the nurse case manager to ascertain what type of paperwork was needed to extend STD. The case manager explained that STD could not be extended and that, without a return to work plan, she would be placed on LTD on October 22, 2001. See Kemper's Heath Care Comments for case 733561; Defendants' Statements at ¶ 42. In response, Ellis informed the case manager that she would be meeting with Dr. Mahon who would most likely be recommending a long-term rehabilitation program when Ellis returned to work. Plaintiffs' Statements at ¶ 43. After speaking with Ellis, the case manager advised Ellis' supervisor, Traver, that Ellis would most likely transition into some type of LTD rehabilitation program and asked that she contact Kemper to discuss the ability

---

[2]Ellis disputes the fact that she choose not to elect for the income-replacement benefits for Long Term Disability. Rather, she testified that to elect for the benefits, she had to certify that she was healthy at the time of the election, and because she felt that she was not healthy, she was under the impression that she was barred from those benefits. Ellis' Dep. at p. 119-120.

to accommodate Ellis. Defendants' Statements at ¶ 44; Plaintiffs' Statements at ¶ 44. Kemper also advised Ethicon's Occupational Health Nurse, Joan Greenhalgh, that Ellis might be returning to work through an LTD rehabilitation program and asked Ms. Greenhalgh to speak to Human Resources ("HR") about eligibility. Id. at ¶ 45. Kemper contacted Dr. Mahon and Dr. Watson for updated medical information and requested that they be involved in any return to work plan, reminding them that any arrangements for LTD rehabilitation must be made prior to October 22, 2001. Id. at ¶ 46. The doctors were also given a Release to Return to Work and a Physician's Report form to be completed. Id.

On October 3, 2001, Ms. Greenhalgh began the process for Ellis to return to work. She sent an email to Ellis advising that she was aware that Ellis wanted to return to work and stressing that any return to work plan needed to be received as quickly as possible so that a return to work meeting could be scheduled with Dr. Cole. See Ms. Greenhalgh's Email dated October 3, 2001. At that time, Ellis believed that this return to work appointment with Dr. Cole would follow the same procedure as in 1999. She expected that Dr. Cole would speak to her doctors and adjust any return to work plan submitted. See Ellis' Dep. at pp. 112-113.

On October 5, 2001, Dr. Watson left a message with Kemper's nurse case manager confirming that she understood the urgency for written medicals and a return to work plan. Dr. Watson also informed the case manager that if Ellis did return to work, she would need to work from home three days per week and two days at the site. She said that Ellis did not have the stamina to withstand the pressures and distractions at the worksite and that allowance for a job coach would be critical. Defendants' Statements at ¶ 50; see Kemper Health Care Comments for case 733561 dated October 5, 2001. On October 8, 2001, the

8

case manager advised Traver about the conversation with Dr. Watson.  Traver then voiced concerns about Ellis' ability to do the job as she was going to be out of the office three days a week.  She stated that there was no meaningful work for Ellis that would fit into the restrictions.  Defendants' Statements at ¶ 51.

Pursuant to Kemper's request, on October 9, 2001, Dr. Watson faxed her return to work recommendations to Kemper along with the advice that Dr. Mahon was the treating physician and he would release Ellis to return to work.  See Dr. Watson's Faxed Letter dated October 9, 2001.  Dr. Watson specifically recommended certain accommodations and provided a detailed gradual return to work plan.  See Id.  In addition, Kemper received a letter and a Return to Work release from Dr. Mahon which also enclosed the evaluation from Dr. Watson.  See Dr. Mahon's Letter dated October 11, 2001.  In the letter, Dr. Mahon stated that the limitations listed in Dr. Watson's recommendations would need to be maintained permanently and indefinitely.[3] Id.

After being advised of the restrictions and their permanent nature, Traver informed Kemper that she would not accommodate a permanent requirement of working at home three days per week because Ellis would not be able to fulfill the essential functions of a Staff Quality Engineer.[4]  Ms. Traver's Dep. at pp. 27-35.  On October 15, 2001, Kemper

_____

[3]The parties dispute Dr. Mahon's restrictions in his letter dated October 11, 2001. Ethicon argues that Dr. Mahon's letter meant that the restrictions were permanent and that it would have to be in place indefinitely.  Defendants' Statements at ¶ 56.  On the other hand, Plaintiffs argue that Dr. Mahon meant that Ellis' brain damage was permanent and that the restrictions, which according to Dr. Mahon's letter would be indefinite, were not permanent.  Plaintiffs' Statements at ¶ 56.

[4]Traver, however, did candidly suggest that had there been an opportunity for continuous revisiting of the situation and had there been an opportunity to have an ongoing conversation rather than just the restrictions from Dr. Mahon, then she would

advised Ellis that Ethicon could not accommodate the permanent restrictions and that she would be rolled over to LTD on October 22, 2001.  <u>See</u> Kemper's Email dated October 15, 2001.

On October 18, 2001, Ellis' attorney contacted Ethicon's in-house counsel, Lisbeth Warren, and faxed a letter to Ms. Warren the next day informing her that Ethicon had rejected Ellis' proposed accommodations without discussion and without any attempt to work with Ellis in facilitating a return to her position.  <u>See</u> Attorney Letter dated October 19, 2001 at p. 2.  During the course of the discussion between Ms. Warren and Ellis' Attorney, Ms. Warren mentioned the possibility of part-time work, for which Ellis could maintain her medical benefits and her salary would remain the same, prorated for the reduced hours.  Warren Decl. at ¶ 5; Plaintiffs' Statements at ¶ 64.  However, Ellis was not interested in the part-time position, and no other alternative was suggested.  <u>Id.</u>

Meanwhile, Ellis applied for a position as a statistician at another company, Aventis-Pasteur ("Aventis"),  in August 2001, and on October 23, 2001, she was offered the job. Ellis turned the position down because she was concerned about how her medical condition would affect her performance at the new job, and the implications of taking the new position while filing a complaint against Ethicon.  On December, 7, 2001, Ellis received a second job offer from Aventis and, on December 17, 2001, she began full time employment at Aventis.  Defendants' Statements at ¶ 65; Plaintiffs' Statements at ¶ 65.

In April 2002, Ellis filed a discrimination charge against Ethicon with the New Jersey Division on Civil Rights ("DCR") alleging that Ethicon failed to accommodate her

---

have been able to consider some accommodations.  Ms. Traver's Dep. at p. 31.

disability.  That claim was dismissed with a finding of "no cause" in 2004.  In December 2004, the Equal Employment Opportunity Commission adopted the findings of the DCR and issued a "Right to Sue" letter to Ellis.  Thereafter, in February 2005, Ellis filed the instant suit.

## DISCUSSION

### I.    Summary Judgment Standard

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. (56)(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  Id.  The burden of establishing that no "genuine issue" exists is on the party moving for summary judgment. Celotex, 477 U.S. at 330.   Once the moving party satisfies this initial burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  To do so, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324.  In other words, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Ridgewood Bd. of Ed. v. Stokley, 172 F.3d 238, 252 (3d Cir. 1999).  A genuine issue of material fact is one that will permit a reasonable jury to return a verdict for the non-moving party. Anderson, 477 U.S. at 248.

In evaluating the evidence, a court must "view the inferences to be drawn from the underlying facts in the light most favorable to the [non-moving] party." Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002)(citations omitted).

### I. Johnson and Johnson as a Defendant

J&J contends that because Ellis failed to name it on her Charge of Discrimination filed with the EEOC or the New Jersey Division on Civil Rights, she has failed to exhaust her administrative remedies with respect to the claims against J&J in this case. Indeed, a plaintiff alleging ADA violations must first exhaust administrative remedies by filing a charge with the EEOC or the DCR. See 42 U.S.C. 12203(c)(citing to 42 U.S.C. 12117(a) and referring to 42 U.S.C. 2000(e) for the proper remedies and procedures for retaliation claims). The relevant test in determining whether plaintiff has exhausted her administrative remedies "is whether the acts alleged in the subsequent . . . suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." Antol v. Perry, 82 F.3d 1291, 1295 (3d Cir. 1996) (quoting Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984)). Even under the Third Circuit's liberal construction of that rule, because J&J was never listed on the EEOC charge or the DCR charge, Ellis has failed to put J&J on notice of the claims in this case. Although Ellis argues that the claims in this matter implicate certain J&J employees (i.e., Dr. Cole and Ms. Warren), the important inquiry here is notice. While these employees work for J&J, their involvement was in the context of Ellis' employment at Ethicon. Thus, it would strain the Court to hold that J&J had notice of these claims when in fact Ellis only named Ethicon in her charges. Accordingly, summary judgment is granted to J&J.

### II.  Failure to Accommodate under the ADA

Section 12112(a) of Title 42, United States Code, provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  A "qualified individual with a disability" is defined by the ADA as a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  Accordingly, to establish a prima facie case of discrimination under the ADA, a plaintiff must show "(1) [she] is a disabled person within the meaning of the ADA; (2) [she] is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) [she] has suffered an otherwise adverse employment decision as a result of discrimination."  Gaul v. Lucent Technologies, 134 F.3d 576, 580 (3d Cir. 1998)(citations omitted); Williams v. Philadelphia Housing Auth. Police Dept., 380 F.3d 751, 761 (3d Cir. 2004).  The ADA specifically provides that an employer "discriminates" against a qualified individual with a disability when the employer does "'not mak[e] reasonable accommodations to the known physical or mental limitations of the individual unless the [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the [employer].'"  Taylor v. Phoenixville School Dist., 184 F.3d 296, 306 (3d Cir. 1999)(quoting 42 U.S.C. § 12112(b)(5)(A))(alterations in original).

The inquiry this Court must make pursuant to the first prong of the three-factor test is whether Plaintiff is disabled under the ADA.  A "disability" is defined by the ADA as : "(A)

a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Accordingly, under the ADA framework, a plaintiff is permitted to assert an "actual disability" under 42 U.S.C. § 12102(2)(A) and a "regarded as" disability under 42 U.S.C. § 12102(2)(c). See Williams, 380 F.3d at 762.[5] Here, Ellis and Ethicon separately move for summary judgment on the issues of whether Ellis is actually disabled and whether Ethicon regarded her as disabled.

### A. Actual Disability

With respect to determining whether an individual is actually disabled within the meaning of the ADA, the Supreme Court has established a three-step process for evaluating a claim of actual disability. Bragdon v. Abbott, 524 U.S. 624, 631 (1998). A court must first determine whether the plaintiff suffered from a physical or mental impairment. Second, the court should determine the life activity allegedly limited by the impairment and whether it qualifies as a "major life activity" under the ADA. Then, the court must determine whether the claimed impairment substantially limited the major life activity. Id. Under this analysis, "a plaintiff who showed that [s]he had an impairment and that the impairment affected a major life activity would nonetheless be ineligible if the limitation of the major life activity was not substantial." Colwell v. Suffolk County Police Dept., 158 F.3d 635, 641 (2d Cir. 1998).

---

[5]Although Ellis asserts a claim for record of impairment under the ADA in her Complaint (Count III), she did not oppose Defendant's request for summary judgment on this count. As such, the Court will grant Defendant's request for summary judgment on this claim. See Damiano v. Sony Music Entertainment, Inc., 975 F. Supp. 623, 637 (D.N.J. 1996)(claims deemed abandoned when the plaintiff raised neither evidence nor argument in opposition to motion for summary judgment).

The EEOC regulations define "major life activity" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i); Tice v. Centre Area Transportation Authority, 247 F.3d 506, 512 (3d. Cir. 2001).   Under the EEOC's interpretive guidelines, determining whether an individual is substantially limited in one or more of the major life activities requires a two-step analysis. Mondzelewski v. Pathmark Stores, Inc., 162 F.3d 778, 783 (3d Cir. 1998). First, the court determines whether the individual is substantially limited in any major life activity other than working, such as walking, seeing, or hearing. 29 C.F.R. Pt. 1630, App. § 1630.2(j).  In making this determination, the court compares the effect of the impairment on that individual as compared with the "average person in the general population." 29 C.F.R. § 1630.2(j)(1).   EEOC Regulations[6] provide that an individual is "substantially limited" in performing a major life activity if the individual is: (i) unable to perform a major life activity that the average person in the general population can perform; or (ii) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.  29 C.F.R. § 1630.2(j)(1); Williams, 380 F.3d at 762.  In addition, the regulations specify that the following factors should be considered in determining whether an individual is substantially limited in a major life activity: (i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and the

---

[6]Because the ADA does not define many of the pertinent terms, the Third Circuit has held that the Regulations issued by the EEOC are instructive in this context.  Deane v. Pocono Medical Center, 142 F.3d 138, 143 n.4 (3d Cir. 1998).

permanent or long term impact or the expected permanent or long term impact of or resulting from the impairment. 29 C.F.R. § 1630.2(j)(2); Weisberg v. Riverside Township Board of Education, 180 Fed. Appx. 357, 361 (3d Cir. 2006). The analysis should be conducted in light of the facts that existed at the time of the alleged discrimination and not in light of conditions that developed years later. See Taylor, 184 F.3d at 308 (plaintiff must show she was substantially limited during the time span when she says she was denied reasonable accommodation). Moreover, the question of whether an individual is substantially limited in a major life activity is a question of fact. Williams, 380 F.3d at 763.

If the court finds that the individual is substantially limited in any of the major life activities other than working, the inquiry ends there. Mondzelewski, 162 F.3d at 784. On the other hand, "if the individual is not so limited, the court's next step is to determine whether the individual is substantially limited in the major life activity of working." Id. In this case, Ellis asserts that her brain injury impaired three major life activities: cognitive function (i.e., learning, concentrating, thinking and remembering), caring for herself, and working.

### 1. Major Life Activity of Cognitive Function

Learning, concentrating and remembering fall into the general category of cognitive function. The Third Circuit has held such activities to be major life activities. See Weisberg, 180 Fed. Appx. at 362; see also Gagliardo v. Connaught Laboratories, Inc., 311 F.3d 565 (3d Cir. 2002). Ellis argues that she is substantially limited in her cognitive function, and in support thereof, she provides medical evidence as well as her and her husband's subjective testimony. In particular, Ellis asserts that she has been plagued by multiple symptoms - such as fatigue, dizziness, problems focusing and concentrating, problems tracking meeting

topics, no comprehension of time, and making multiple mistakes at work - ever since her accident in 1999. These symptoms, however, were not medically diagnosed until April 2001.

To prove the severity and the nature of her impairment, Ellis proffers the medical diagnosis from her neurologist, Dr. Mahon. Dr. Mahon examined Ellis in April 2001. He noted that she had suffered from severe mood swings since the accident, along with other symptoms including headaches, blurred vision and memory problems. Dr. Mahon diagnosed Ellis with "concussion with post concussion - severe." See Dr. Mahon's letter dated April 6, 2001 at p. 2. Dr. Mahon later testified during his deposition that he "was skeptical that [Ellis] could return to [the] work place." Dr. Mahon's Dep. at p. 10. It was his opinion that Ellis' brain damage was permanent. Id. at p. 32.

Ellis also sought the care of Dr. Watson, her neuropsychiatric. In Dr. Watson's report, she listed some of Ellis' symptoms: "she can no longer 'multitask'", she has "underlying memory and organization problems", and she has "trouble reading due to . . . accident-related convergence insufficiency that causes blurry vision." See Dr. Watson's Report dated May 1, 2001 at p. 2. The report further indicated that Ellis' "cognitive changes involve problems with concentration, speed and clarity of thinking, word retrieval and usage, memory, organizing and planning her time, spelling and reading." Id. at p. 1. Tests revealed that Ellis could not learn new material except with repetition. Id. at p. 4. Dr. Watson noted that " high-level attention was stressful and required significant effort." Id.[7]

_____

[7]While Defendant argues that because Dr. Watson was never offered as an expert on this topic, Ellis should be precluded from relying on Dr. Watson's report that she is limited in a major live activity, the Court will, nevertheless, consider Dr. Watson's report for the purpose of this motion since her diagnosis was relied upon by Dr. Mahon when

Ellis also worked with Ms. Debra Dudeck-Sparta, a cognitive re-trainer at Good Shepard Rehabilitation Hospital.  Ms. Dudeck-Sparta indicated on October 1, 2001, that Ellis had residual cognitive impairments which included: "decreased thought organization, decreased ability to sustain concentration over time, inability to multitask, mental fatigue, decreased ability to make decisions under pressure or time limits, decreased information processing, decreased executive functions, inability to set limits, challenged to self-monitor and self-evaluate, and decreased short-term memory."  <u>See</u> Ms. Dudeck-Sparta's Report dated October 1, 2001.

Defendant contends that the medical report submitted by Dr. Watson demonstrates that Ellis is not substantially limited by her impairment of post-concussion disorder.  To illustrate this point, Defendant points to the following conclusions by Dr. Watson in her report:

> <u>Intellectual functioning</u>: "verbal abilities are strong falling in the above-average range (Verbal IQ = 87th percentile); skills dependent on speeded visual-perception analysis are significantly lower; falling in the average range (Performance IQ = 63rd percentile)."  With the expcetion of a very superior score on the test of expressive vocabulary (98th Percentile), all scores [on verbal IQ] were above average (75[th]- 84th percentiles)."
>
> "In contrast, with one exception, scores earned on tests of visual perceptual organization and visual processing speed were average (37th to 63rd percentiles) . . . When time is factored out, her score improves from average (63d percentile) to above average (84[th] percentile)."
>
> <u>Speed of Processing</u>:   "was normal for orally presented numerical information" and "was generally average" for visually presented material.
>
> <u>Auditory working memory</u>: "For the most part, Ms. Ellis performed tasks requiring this skill - digit span, mental arithmetic, letter-number sequencing - in a normal (average) way . . . [P]erformance on tests of

he made his final recommendations and diagnosis to Ethicon on October 9, 2001.

memory for verbal material reveal average encoding abilities (Auditory Immediate Index = 102; 55th percentile) with above average retrieval and recognition (Auditory Delayed Index = 117; 97th percentile; Auditory Recognition Index = 110; 75th percentile) . . . Repetition is necessary for learning. With multiple repetitions, Ellis learns new auditory material in a normal albeit average way as demonstrated by her scores on a separate list learning test."

Visual Memory: "This level of performance is compatible with [Ellis'] reports of a strong 'photographic memory [prior to her head injury]." (Visual Immediate Index = 138; 99th percentile; Visual Delayed Index = 140; 99th percentile). "Conformation (picture) naming was low average (10th percentile) and . . . retrieval from long-term memory is at the low end of average (25th percentile). Silent timed reading comprehension and knowledge of vocabulary was within normal limits."

Complex novel problem solving: "requiring the ability to reason inductively with nonverbal spatial and proportional concepts, shift problem-solving strategy in response to direct feedback, and maintain focused attention over time, was mildly impaired."

See Dr. Watson's Report Dated April 21, 2001 at pp. 3-4. Based on the foregoing test results, Defendant contends that while Ellis' pre-concussion cognitive abilities were superior, as indicated by Dr. Watson, her post-concussion abilities merely went from superior to average, which fall short of the substantially limiting test of the ADA. Additionally, Defendant contends that Plaintiff continued to work as a quality engineer and that within two months of her employment ending at Ethicon, Ellis was hired by Aventis as the project manager for development of a flu vaccine. As such, Ellis was capable of functioning, without substantial limitations, in her work environment.

To further support its contention, Defendant primarily cites to the Weisberg opinion from the Third Circuit. In Weisberg, the plaintiff, a former superintendent of schools, was struck in the head by a large wooden speaker that fell from a wall behind his desk. He was diagnosed with post-concussion syndrome and complained of stress; anxiety and

depression adversely affecting his attention, concentration and speed; profound incapacitating fatigue that markedly interferes with functioning; slow to perform tasks, even those that are performed well; headaches; poor memory; and irritability.  Weisberg, 180 Fed. Appx. at 359-60.  The court there conducted an analysis of the plaintiff's cognitive tests, which showed that even though his cognitive abilities fell between average and below average, those results did not place the plaintiff substantially below the norm.  Id. at 362. In addition, the court found that because the plaintiff failed to adduce evidence to show the extent of limitation in terms of his own experience (the plaintiff only testified that sometimes he forgets certain things or events), he failed to show that he was "severely restricted" by his impairments.  Id. at 363.  Moreover, the court also found that the plaintiff failed to address the duration and impact of his impairment.  Coupled with contradictory facts that the plaintiff was not severely restricted (e.g.., attends nearly all of the Giant's home game, eats out roughly three nights a week, follows his investments in the stock market, plays certain games in Atlantic City casinos, and most importantly, was able to work forty hours a week), the court held that the plaintiff failed to carry his prima facie case of actual disability on the issue of whether he was substantially limited in the major life activity of "cognitive functioning."  Id. at 360, 363.

While Ellis' objective cognitive test results show that her abilities fell between average to below average, the facts of this case contrast with those of Weisberg.  From a medical perspective, it was the opinion of both Dr. Mahon and Dr. Watson that because of Ellis' symptoms from her head injury, she was unable to continue at the pace she had been working at Ethicon prior to her leave of absence and that her hours and responsibilities at work must be reduced, followed by an accommodated work environment.  See Dr. Watson's

Report dated April 21, 2001 at pp. 5-6; see also Dr. Watson's Letter dated October 8, 2001 (the letter provided that Ellis must be accommodated in the workplace, i.e., work three full days in a distraction-free, controlled environment; work remotely for three days and travel into the office on two days; involvement of a job coach to help Ellis rehabilitate to the work setting; and enroll in a community skills program). Notably, Dr. Watson stated, in his April 11, 2001 letter to Ethicon, that Ellis' cognitive limitations were permanent and certain accommodations must be provided. See Dr. Watson's Letter dated April 11, 2001 at p. 1. These medical conclusions were not reached in Weisberg.[8]

Furthermore, "ADA requires those 'claiming the Act's protection. . . to prove a disability by offering evidence that the extent of the limitation [caused by the impairment] in terms of their own experience . . . is substantial." Toyota v. Motor Mfg., Ky., v. Williams, 534 U.S. 184, 197 (2002)(quoting Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 567 (1999)). Ellis testified in her declaration and deposition that due to her symptoms, she was unable to coordinate her personal life functions without assistance. See Ellis' Decl. at ¶ 5. Specifically, during the relevant period of time when she was employed by Ethicon, post-accident, Ellis stated that her husband had to facilitate her life skills functioning, which

---

[8]Defendant argues that Ellis has failed to provide competent medical evidence to meet the ADA standard of her impairments. Ethicon cites to a case arising out of the Second Circuit, Sussle v. Sirina Protection Systems Corp., 269 F. Supp. 2d 285 (2d Cir. 2003), for the proposition that Ellis must present medical evidence to explain her impairments to the jury. However, the Third Circuit has held that "the necessity of medical testimony turns on the extent to which the alleged impairment is within the comprehension of a jury that does not possess a command of medical or otherwise scientific knowledge." Marinelli v. City of Erie, 216 F.3d 354, 360 (3d Cir. 2000). Even if the cognitive issues are beyond the normal jury ken, the Court finds that the medical evidence in this motion, namely, Dr. Watson's report and Dr. Mahon's diagnosis, provide sufficient explanation of Ellis' impairments.

included planning activities such as getting dressed, taking medication, diet, rest, medical appointments, bathroom activities, hygiene, etc.  She was no longer able to do chores around the house.  Id. at ¶¶ 5-6.  In fact, Ellis' husband gave up his work to support her recovery.  Id. at ¶ 11.  Ellis testified that all she could manage to do was work and sleep.  Id. However, Ellis insisted that she continued to work despite her conditions.  These statements were supported by the medical diagnoses from Dr. Watson and Dr. Mahon.

In evaluating Ellis' limitations, focusing on what Ellis "has managed to achieve misses the mark."  Emory v. Astrazeneca Pharaceuticals LP, 401  F.3d 174, 180 (3d Cir. 2005).  While evidence of tasks - such as her continued employment with Ethicon and Aventis - that Ellis can successfully perform may " seem to serve as a natural counterpoint when evaluating disability, the paramount inquiry remains" does [Ellis] 'have an impairment that prevents or severely restricts [her] from doing activities that are of central importance to most people's daily lives'?"  Id. at 180-81 (quoting Toyota, 534 U.S. at 197). "What [Ellis] confronts, not overcomes, is the measure of substantial limitation under the ADA."  Id. at 181; see Emory, 401 F.3d at 183 ("when significant limitations result from the impairment, the definition is met even if the difficulties are not insurmountable" (quotations and citations omitted in original)).

Furthermore, to demonstrate the duration or expected duration of her impairment, and the permanent or long term impact or the expected permanent or long term impact resulting from the impairment, Ellis provides sufficient evidence to show that her injury may have caused permanent impairments in her ability to function cognitively.  See Dr. Watson's Letter dated October 11, 2001.  Accordingly, based on her testimony and the doctors' diagnoses, the Court finds that Ellis has raised a genuine issue of material fact to

survive summary judgement on whether her major life activity of cognitive function has been substantially limited by her post-concussion impairments.

The Court also notes that, on this issue, both parties moved for summary judgment. However, the Court will deny both parties' requests for summary judgment for primarily two reasons. First, the determination of whether an individual is substantially limited in a major life activity is a question of fact. <u>Williams</u>, 380 F.3d at 763. As such, it is appropriate to submit this issue to the factfinder. Also, Defendant has raised questions regarding the sufficiency of Ellis' supporting evidence by demonstrating that Ellis may not have been substantially limited by her impairments since the objective cognitive tests tended to show that her abilities fell between average and below average. Such evidence raises a genuine issue of material fact as to whether Ellis was substantivally limited in her major life activity of cognitive function as compared to the average person in the general population. <u>See</u> <u>Weisberg</u>, 180 Fed. Appx. at 362; <u>see</u>, <u>e.g.</u>, <u>Kaufer v. UPMC Health Plan, Inc.</u>, No. 04-1325, 2006 U.S. Dist. LEXIS 47629, at *20-21 ( W.D. Pa. Jul. 13, 2006)(the court found that the plaintiff, who suffered an aneurism which caused short-term cognitive deficits that were substantially resolved within four months, could defeat summary judgment on the issue of whether he was actually disabled under ADA); <u>Pagonakis v. Express, LLC.</u>, No. 06-027, 2008 U.S. Dist. LEXIS 11332, at *20-21 (D. Del. Feb. 14, 2008)(the court denied summary judgment after considering plaintiff's diagnosis of a "traumatic brain injury", which may have limited her ability to think, hear, see and work); <u>Cohen v. Phillips Medical Systems, Inc.</u>, No. 03-0695, 2006 U.S. Dist. LEXIS 44322 (N.D. Ohio Jun. 15, 2006)(the court found that the plaintiff's cognitive impairment substantially limited her ability to learn and work despite the fact that she continued to work in two

comparable positions, without accommodations, after the defendants failed to rehire her).

## 2. Major Life Activity of Caring for Oneself

To claim that Ellis was substantially limited in her ability to care for herself, Ellis has not pointed to any specific activities in her life that she has been restricted from performing as a result of her injury. Instead, Ellis states in a conclusory manner that she "could no longer care for herself, and that she expended all her physical and mental energy just trying to cope in the workplace and relied upon her husband to take care of all the household responsibilities." See Ellis' Brief in Opposition to Defendants' Summary Judgment Motion at p. 13. The Third Circuit has held that examples of the inability to care for oneself include the ability to keep oneself clean and to pick up trash to sufficiently keep the dwelling place sanitary. See Marinelli, 216 F.3d at 362-63 ("cleaning is only considered a major life activity to the extent that such an activity is necessary for one to live in a healthy or sanitary environment"). Ellis simply asserts that she was always fatigued so that her husband handled the household chores so that she could focus on work. She clearly bathed and took care of her personal hygiene which allowed her to function daily at home and in the workplace. The Court will not give credence to Ellis' allegations that she could not care for herself which essentially amount to "self-serving conclusions" that are unsupported by specific facts in the record. See Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 (3d Cir. 1990). This is simply not enough to support a substantial limitation of caring for oneself. Accordingly, Defendant's motion for summary judgment is granted with respect to this issue.

## 3. Major Life Activity of Working

In order for a plaintiff to demonstrate that she is substantially limited in the major

life activity of "working", she must show that she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(I); see Sutton v. United Air Lines, 527 U.S. 471, 492 (1999)("[t]o be substantially limited in the major life activity of working . . . one must be precluded from more than one type of job, a specialized job, or a particular job of choice"); see also Cetera v. CSX Transp., Inc., 191 Fed. Appx. 151, 152 (3d Cir. 2006).  Courts consider the geographical area, the number of jobs making use of the plaintiff's skills (class of jobs), and number of jobs that the plaintiff could perform (broad range of jobs).  29 C.F.R. § 1630.2(j)(3).  A plaintiff is not disabled because she cannot perform a specific job, if other jobs making use of her qualifications are available.  Sutton, 527 U.S. at 492.

Similarly, for this particular major life activity, Ellis has not provided sufficient evidence to prove that she was precluded from working either a class of jobs or a broad range of jobs.  Ellis, again, in a conclusory manner, states that she was substantially impaired from working in the class of jobs involving engineering skills and training.  To support her conclusion, she refers to Dr. Mahon's testimony which revealed the doctor's doubt regarding Ellis' ability to return to the workplace.  Dr. Mahon's Dep. at p. 10. However, in the same testimony, Dr. Mahon conceded that he deferred to Dr. Watson's judgment as to whether Ellis could return to work.  Id.  Dr. Mahon explained that he and Dr. Watson made an effort "to get [Ellis] back to work."  Id.  The doctor further explained that "[i]t was, from my standpoint, and I think probably anybody involved in her case, we were very hopeful that we could do something to help her get back to her . . . previous level of functioning."  Id.  At best, the medical evidence in the record, shows that Ellis could not

perform her job as a quality engineer without certain accommodations.  Such evidence is insufficient to show that Ellis was precluded from working in either her class of jobs, or a broad range of jobs in various classes.  See Mulholland v. Pharmacia & Upjohn, Inc., 52 Fed. Appx. 641, 647 (6th Cir. 2002) .

Furthermore, it is undisputed that Ellis applied for work with Aventis while still collecting short-term disability benefits from Ethicon.  Two months after her termination from Ethicon, Ellis accepted an offer from Aventis leading a project team to develop a flu vaccine.  At this new job, she did not ask or need accommodations and worked without them until November 2003, when she took another medical leave of absence.  While the Court recognizes that the disability determination must be made at the time of employment decision, see Taylor, 184 F.3d at 308, the closeness in temporal proximity between Ellis' new position and her termination at Ethicon demonstrates that she was not significantly limited from working in a broad range of jobs.  See Peter v. Lincoln Technical Institute, Inc., 255 F. Supp. 2d 417, 435 (E.D. Pa. 2002)(a plaintiff cannot be significantly limited in the activity of working when she immediately found another similar job, working without restrictions and was never reprimanded for any work-related effects of her alleged disability and neither requested or received any accommodations for it).  Accordingly, without the proper evidentiary support, summary judgment is also granted in Defendant's favor on the issue of whether Ellis was substantially limited in the major life activity of working.

### B.  "Regarded As" Disability

With respect to Plaintiff's "regarded as" claim, even if Plaintiff does not suffer from an actual disability, if she is able to establish that her employer regarded her post concussion syndrom as substantially limiting her ability to work, then her claim should

26

survive summary judgment.  A person is "regarded as" having a disability if she:

>       (1) has a physical or mental impairment that does not substantially limit major life activities but is treated by the covered entity as constituting such impairment;

>       (2) has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

>       (3) has no such impairment but is treated by a covered entity as having a substantially limiting impairment.

29 C.F.R. § 1630.2(l); see Taylor v. Pathmark Stores, Inc., 177 F.3d 180, 187 (3d Cir. 1999).

In other words, to be "disabled" under the "regarded as" portion of the ADA's definition of disability, the plaintiff must demonstrate that: (1) despite having no impairment at all, the employer erroneously believed that she had an impairment that substantially limited one or more of her major life activities; or (2) she had a non-limiting impairment that PRD mistakenly believed limited one or more of her major life activities.  See Tice, 247 F.3d at 514 (citing Sutton, 527 U.S. at 489).  "[E]ven an innocent misperception based on nothing more than a simple mistake of fact as to the severity . . . of an individual's impairment can be sufficient to satisfy the statutory definition of a perceived disability."  Deane, 142 F.3d at 144; see Taylor, 177 F.3d at 182.  "The relevant inquiry relates to the perception, or intent, of the employer; not whether the plaintiff was actually disabled at the time."  Eshelman v. Agere Systems, 397 F.Supp. 2d. 557, 563 (E.D. Pa.  2005); Capobianco v. City of New York, 422 F.3d 47, 57 (2d Cir. 2005).

However, the "regarded as" disability must be "an impairment within the meaning of the statutes, not just that the employer believed the employee to be somehow disabled."  Rinehimer v. Cemcolift, Inc., 292, F.3d 375, 381 (3d Cir. 2002); Robinson v. Lockheed

<u>Martin Corp.</u>, 212 Fed. Appx. 121, 125 (3d Cir. 2007).  As such, the perceived condition must limit a major life activity and the limitation must be substantial, which means plaintiff would have to show that her employer believed she was limited in her ability to work in "'either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.'"  <u>Robinson</u>, 212 Fed. Appx. at 125 (quoting <u>Sutton</u>, 527 U.S. at 491).  Simply put, to be "regarded as substantially limited in the major life activity of working, one must be regarded as precluded from more than a particular job."  <u>Murphy v. United Parcel Serv., Inc.</u>,  527 U.S. 516, 523 (1999).

Ellis points to several incidents in the record to support her contention that Ethicon regard her as disabled due to neurological disabilities.  To the contrary, those facts in the record support a finding that Defendant did not regard Ellis as disabled.  First, Ellis asserts that "a J&J independent consultant" spoke with her doctor and he concluded that she would lack the ability to perform the core elements of her job.  This statement was taken from a memo written by a doctor working for Kemper Insurance Company in Florida who was asked to evaluate Ellis' medical condition for the purpose of approving her continuing short-term disability.[9]  However, Plaintiff did not adduce evidence to show,  nor did she even suggest, that any decision makers at Ethicon viewed the particular document.

---

[9]This memo was a document prepared to determine whether Ellis was eligible for short-term disability.  Thus, it is important to note that this type of determination does not meet the qualifications for being "disabled" under the ADA.  <u>See</u> <u>Bennett v. Calabrian Chemicals Corp.</u>, 126 Fed. Appx. 171, 172 (5th Cir. 2005)("the legal definition of a disability under the ADA is different from the eligibility criterion for [plaintiff's] short-term disability plan . . ."); <u>see also</u> <u>Weigel v. Targe Stornes</u>, 122 F.3d 461, 466 (7th Cir. 1997)("the Social Security Administration's decision to grant disability benefits to [plaintiff] is not determinative as to whether or not she may be considered a "qualified individual" under the ADA").

28

According to Traver, Ellis' Department Director or supervisor, she never saw the doctor's reports, and was never aware of Ellis' medical condition other than the fact that Ellis had some type of "brain-related trauma." Traver's Dep. at pp. 86, 13. Even more compelling is the fact that Traver testified that she perceived Ellis to be "very capable, very technically astute, well organized, well regarded, well respected." Id. at p. 12. It was always her impression that Ellis would return after her short-term disability leave expired. Id. at 28. Likewise, for the same reasons, Kemper's notes written by its case manager in which she expressed the opinion that Ellis would most likely transition into LTD cannot possibly show that Ethicon regarded Ellis as disabled.

Next, Ellis points to emails from Joan Greenhalgh and Valerie Pax in early October 2001, which were discussions regarding Ellis' STD status and her work status in general and the permanent restrictions recommended by Ellis' doctors. See Mr. Zuckerman's Decl. at Exh. 7. Nothing in these documents indicates that Ms. Greenhalgh, Ms. Pax or Dr. Cole regarded Ellis to be disabled as defined under the ADA. Certainly, the questions posed by Ms. Pax in her emails (such as, "can she perform the essential functions of her current job?" or "Can they accommodate without it negatively impacting the essential needs of the business?") do not show that she regarded Ellis as being precluded from more than a particular job. Similarly, Dr. Cole's memo regarding Ellis' conditions does not create a genuine issue of material fact. Dr. Cole merely echoes the diagnosis from Ellis' doctors. Her concurrence with Dr. Mahon's findings, and her view that Ellis would require very specific restrictions in order for her to function at work, are simply Dr. Cole's impression of Ellis' conditions. Indeed, the "regarded as" disability must be "an impairment within the meaning of the statutes, not just that the employer believed the employee to be somehow

29

disabled." <u>Rinehimer</u>, 292 F.3d at 381.  The mere fact that Dr. Cole was aware of Ellis'

impairment is "insufficient to demonstrate either that [Ethicon] regarded [Ellis] as disabled

or that that perception caused the adverse employment action."  <u>Kelly v. Drexel Univ.</u>, 94

F.3d 102, 109 (3d Cir. 1996).  Accordingly, Ellis has failed to point to any evidence that

would raise a genuine issue of material fact demonstrating that Ethicon regarded her as

disabled.  Summary judgment is, therefore, appropriate on this issue as well.

### C.     The Interactive Process

Both parties have moved for summary judgment on this claim.  Ellis contends that

Defendant violated the ADA by failing to engage in the interactive process.  Indeed,

engaging in the interactive process is a "mandatory rather than a permissive obligation on

the part of employers under the ADA." <u>Barnett v. U.S. Air, Inc.</u>, 22b F.3d 1105, 1114 (9th Cir.

2000); <u>see</u> <u>also</u> <u>Taylor</u>, 184 F.3d 296; <u>Williams</u>, 380 F.3d at 771 (both the employee and the

employer "have a duty to assist in the search for appropriate reasonable accommodation

and to act in good faith" (quotations omitted)).  The Third Circuit has explained that "once

a qualified individual with a disability has requested provision of a reasonable

accommodation, the employer must make a reasonable effort to determine the appropriate

accommodation.  The appropriate reasonable accommodation is best determined through

a flexible, interactive process that involves both the employer and the [employee] with a

disability."  <u>Id.</u> at 311 (citations omitted).  It is not fatal to the employee's claim if the

employee requests an accommodation that is not possible.  "The interactive process, as its

name implies, requires the employer to take some initiative."  <u>Id.</u> at 315.  "The interactive

process would have little meaning if it was interpreted to allow employers, in the face of a

request for accommodation, simply to sit back passively, offer nothing, and then, in post-

termination litigation, try to knock down every specific accommodation as too burdensome." Id.  In short, "an employer who has received proper notice cannot escape its duty to engage in the interactive process simply because the employee did not come forward with a reasonable accommodation that would prevail in litigation." Id. at 317.

Essentially, an employee may establish that an employer failed to engage in the interactive process in good faith by showing that (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith.  Williams, 380 F.3d at 772 (quotation omitted).

The Third Circuit has listed several methods in which employers can show good faith in the interactive process.  Employers can "meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered employee's request, and offer and discuss available alternatives when the request is too burdensome." Id.  The EEOC also obligates the employer to: (1) analyze the particular job involved and determine its purpose and essential functions; (2) consult with the disabled employee to understand her precise job-related limitations and how they could be overcome with a reasonable accommodation; (3) in consultation with the disabled employee, identify potential accommodations; and (4) considering the preference of the individual to be accommodated, select and implement the most appropriate accommodation.  29 C.F.R. Pt. 1630, App. § 1630.9.

The undisputed facts of this case clearly indicate that Ethicon failed to properly

engage in the interactive process.    The first notice Ethicon received regarding Ellis'
accommodations came from an email sent by Ellis' husband to Kemper on August 31, 2001.
The email indicated that Ellis would like to return from STD leave after it ended but she
needed certain accommodations, which would be recommended by Dr. Mahon after their
mid-September session. Thereafter, on October 2, 2001, Ellis called the nurse case manager
and informed the case manager that she would be meeting with Dr. Mahon who would most
likely recommend a long-term rehabilitation program when Ellis returned to work.

After speaking with Ellis, the case manager advised Ellis' supervisor, Traver, that
Ellis would most likely transition into some type of LTD rehabilitation program and asked
that she contact Kemper to discuss the ability to accommodate Ellis.  Kemper also advised
Ms. Greenhalgh, Ethicon's Occupational Health Nurse, that Ellis might be returning to
work through an LTD rehabilitation program, and asked Ms. Greenhalgh to speak to HR
about eligibility.  On October 3, 2001, Ms. Greenhalgh began the process for Ellis to return
to work.  She sent an email to Ellis advising that she was aware that Ellis wanted to return
to work and stressed that any return to work plan needed to be received as quickly as
possible so that a return to work meeting could be scheduled with Dr. Cole.  However,
Ethicon, then, did not schedule a meeting with Ellis.

Thereafter, Kemper received a phone call from Dr. Watson on October 5, 2001.  The
doctor advised that if Ellis were to return to work, she would need to work from home three
days per week and two days at the site. She reasoned that Ellis did not have the stamina to
withstand the pressures and distractions at the worksite, and that allowance for a job coach
would be critical.  On October 8, 2001, the case manager advised Traver about the
conversation with Dr. Watson.  Traver then voiced concerns about Ellis' ability to do the job

if she was going to be out of the office three days a week. She stated that there was no meaningful work for Ellis that would fit into the restriction. Again, no meeting was scheduled with Ellis to discuss her accommodations.

On October 9, 2001, Dr. Watson faxed her return to work recommendations to Kemper along with the advice that Dr. Mahon was the treating physician and he would release Ellis to return to work. Dr. Watson provided a detailed gradual return to work plan. In addition, Kemper received a letter and a Return to Work release from Dr. Mahon which also enclosed the evaluation from Dr. Watson. In the letter, Dr. Mahon stated that the limitations listed in Dr. Watson's recommendations would need to be maintained permanently and indefinitely. After being advised of the restriction and its permanent nature, Traver informed Kemper that she would not accommodate a permanent requirement of working at home three days per week because Ellis would not be able to fulfill the essential functions of a Quality Engineer. On October 15, 2001, Kemper advised Ellis that Ethicon could not accommodate the permanent restrictions and that she would be rolled over to LTD on October 22, 2001. Even after the last notice from Ellis' doctors, Ethicon failed to engage in the interactive process.

Defendant argues that, through Kemper, Ethicon expressly asked Ellis to provide certain accommodations, and once it was determined that the accommodations were of a permanent nature, Ethicon was relieved of its obligation from the interactive process. In addition, Defendant further argues that discussion between Ellis' attorney and Ethicon is also a part of the interactive process, wherein Ethicon allegedly offered Ellis a part-time position, which she turned down. The Court finds Defendant's arguments unpersuasive and that Ethicon failed to act in good faith.

33

As noted earlier, the Third Circuit has explained that to demonstrate good faith, employers should "meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered the employee's request, and offer and discuss available alternatives when the request is too burdensome." Williams, 380 F.3d at 772. First and foremost, no one at Ethicon met with Ellis once they received notice from Dr. Watson and Dr. Mahon that Ellis would need certain accommodations. No one from Ethicon requested information regarding Ellis' condition and the reasons for the doctors' recommendations. In fact, Traver testified during her deposition that had there been an opportunity for continuous revisiting of the situation and had she had the opportunity to have an ongoing conversation rather than just the restrictions from Dr. Mahon, she would have been able to consider some accommodations. See Ms. Traver's Dep. at p. 31.

Certainly, Ethicon failed to offer alternatives when it determined that the accommodations were too burdensome. It is clear in this Circuit that "an employer . . . cannot escape its duty to engage in the interactive process simply because the employee did not come forward with a reasonable accommodation that would prevail in litigation." Taylor, 184 F.3d at 317; see Humphrey v. Memorial Hospitals Association, 239 F.3d 1128, 1139 (9th Cir. 2001)(citations omitted)("An employer fails to engage in the interactive process as a matter of law where it rejects the employee's proposed accommodations by letter and offers no practical alternatives"). It is difficult for the Court to accept Defendant's argument in this context when Ethicon, during Ellis' first STD leave immediately after her accident, did indeed engage in an informal interactive process whereby Dr. Cole had

expressed her concerns regarding Ellis' accommodations recommended by her orthopedist, and worked with Ellis in formulating another plan. Ethicon simply failed to do so during Ellis' second STD leave.

While there is a dispute whether the discussions between Ms. Warren, in-house counsel, and Ellis' attorney were a part of the interactive process, the Court will not establish a bright-line rule that forbids any attorney discussion as a part of the interactive process. Indeed, the EEOC regulations expressly embrace conversations with the employee or "a family member, friend, health professional, or other representative." See Taylor, 184 F.3d at 313 (quoting EEOC Compliance Manual). Nevertheless, even if the discussions between counsel are a part of the interactive process, Ethicon continued to show a lack of good faith. Although there is some disagreement as to whether a part-time position was offered to Ellis, the conclusion remains the same; the offer, if it was made, was provided to Ellis on a take-it-or-leave it basis. Certainly, nothing in the record indicates that Ms. Warren engaged in a conversation that would satisfy Ethicon's obligation. The inquiry here is whether Ethicon analyzed the particular job involved and determined its purpose and essential functions; consulted with Ellis to understand her precise job-related limitations and how they could be overcome with a reasonable accommodation; in consultation with Ellis, identified potential accommodations; and in considering Ellis' preference to be accommodated, select and implement the most appropriate accommodation. Ms. Warren failed to take these steps. Instead, she offered a part-time position on a take-it-or-leave basis and the discussion ceased once Ellis rejected the offer. Taken together, these actions on the part of Ethicon demonstrate a lack of good faith when engaging in the interactive process. Accordingly, as a matter of law, the Court finds that Defendant failed to engage in

the interactive process.[10]  However, "plaintiff in a disability discrimination case who claims that the defendant engaged in discrimination by failing to make a reasonable accommodation cannot recover with out showing that a reasonable accommodation was possible."  Donahue v. CONRAIL, 224 F.3d 226, 234 (3d Cir. 2000). Thus, "'because employers have a duty to help the disabled employee devise accommodations, an employer who acts in bad faith in the interactive process will be liable *if the jury can reasonably conclude that the employee would have been able to perform the job with accommodations*.'"  Id. at 234-35 (quoting Taylor, 184 F.3d at 317)(emphasis in original).

### D.    "Qualified Individual"

In order for the plaintiff to satisfy the second element of a prima facie case under the ADA, she must demonstrate that she is "otherwise qualified to perform the essential functions of the job, with or without accommodation."   Leshner v. McCollister's Transportation System, 113 F. Supp. 2d 689, 692 (D.N.J. 2000).  The Court has to resolve whether Plaintiff was "otherwise qualified," meaning whether she was qualified to perform the essential functions of her position, with or without reasonable accommodation.  See Gaul, 134 F.3d at 580 (a "qualified individual" is a person who, with or without accommodation, can perform the essential functions of the position that such individual held or desired).  To satisfy this requirement, a plaintiff must first demonstrate that she

---

[10]It is interesting to note that Ms. Warren allegedly offered the part-time position after Ellis' attorney sent her a position letter.  As indicated by counsel for Ellis in her October 19, 2001 letter to Ms. Warren, the denial of the proposed accommodations was issued "without any discussion whatsoever and without any attempt to work with Ms. Ellis in facilitating a return to her position."  See Ms. Hadziosmanovic's Letter dated October 19, 2001 at p. 2.  Although no threat of litigation was mentioned in the letter, this fact buttresses the Court's finding that Ethicon failed to engage in the interactive process in good faith.

"satisf[ies] the requisite skill, experience, education and other job-related requirements of the employment position that [] [she] holds or desires." Deane, 142 F.3d at 145; Skerski v. Time Warner Cable Co., 257 F.3d 273, 278 (3d Cir. 2001). Second, a plaintiff must establish that she, "with or without reasonable accommodation, can perform the essential functions of the position held or sought." Id.

Here, there is no dispute that Ellis had the requisite skills and experience needed for the position. However, Defendant argues that due to a shift in focus from business support to new product development, Ellis would have been required to travel to the manufacturing facilities and product testing sites. She was expected to be fully integrated into the design, development, verification and validation activities for a new product. Ethicon contends that Ellis needed to attend project team meetings, generally on a weekly basis and that the required meetings with the project teams and the outside travel could not be scheduled around just the needs of one team member, Ellis.

While the Court gives deference to Ethicon's representations that being able to attend project meetings and testing sites is essential, the issue of whether Ethicon could have reasonably accommodated Ellis shall be preserved for the factfinder. "[T]he employer will almost always have to participate in the interactive process to some extent before it will be clear that it is impossible to find an accommodation that would allow the employee to perform the essential functions of a job." Taylor, 184 F.3d at 317. "When an employee has evidence that the employer did not act in good faith in the interactive process, . . . we will not readily decide on summary judgment that accommodation was not possible and the employer's bad faith could have no effect." Id. at 318. "[C]ourts should be especially wary on summary judgment of underestimating how well an employee might perform with

accommodations or how much the employer's bad faith may have hindered the process of finding accommodations." Id.   In this matter, the Court has already determined that Ethicon failed to engage in the interactive process in order to determine whether Ellis could have been accommodated due to her condition.  Ellis may have been qualified, because she may have been able to perform the essential functions of the job with reasonable accommodations. As such, the Court holds that Ellis has alleged facts which, viewed in light most favorable to her, present a genuine issue of material fact as to whether reasonable accommodation was possible and whether regular attendance at meetings and testing sites is an essential function of the job; these issues shall be decided by the factfinder.  See Bultemeyer v. Fort Wayne Community Schools, 100 F.3d 1281, 1285 (7th Cir. 1996).[11]

### B.  Breach of Contract Claim and Retaliation Claim under the ADA

Count IV asserts a claim of retaliation under the ADA and Counts VII and VIII assert a claim for breach of contract and breach of the covenant of good faith and fair dealing. Because Ellis chose not to respond to Defendants' summary judgment on Counts VII and VIII, the Court shall grant summary judgment on these two counts.[12]

---

[11]It appears that Ethicon does not contest that Ellis can satisfy the last element of her prima facie case for failure to accommodate, whereby Ellis would have to show that she suffered an otherwise adverse employment decision as a result of discrimination. Gaul, 134 F.3d at 580.  Here, the adverse employment action is being terminated after being placed on long-term disability.  Therefore, Ellis has satisfied the burden of establishing the last element of her prima facie case.

[12]Ellis' breach of contract claim has no merit.  An at will-employee has no expectation of continued employment and can be terminated at any time for any lawful reason.  Bernard v. IMI Sys., Inc., 131 N.J. 91, 105-06 (1993).  Beyond the written materials, Ellis claims that she expected a return to work meeting the Ethicon medical department and expect Dr. Cole to speak with Ellis' doctors because that was what happened previously in 1999.  However, such procedure did not create a contract, either implicitly or expressly.  Once it is determined that no express contract existed, there can

Ellis also brings a retaliation claim against Ethicon.[13]  She argues that retaliation occurred because she exercised her rights under the ADA.  She alleges that the retaliation conduct included (1) refusal to consider the requested accommodations; (2) refusal to have discussions with her or her legal representative; and (3) termination of her employment. In order to sustain this claim under the ADA, Ellis must establish a <u>prima facie</u> case showing (1) protected activity; (2) an adverse employment action; and (3) a causal connection between the protected activity and the adverse action.  <u>Williams</u>, 380 F.3d at 759.  Once the <u>prima facie</u> case is established, the burden of persuasion shifts to defendant to articulate the legitimate business reason for the adverse action.  Then, the plaintiff must proffer evidence showing that the employer's articulated reasons are a pretext for the retaliation.  <u>Id.</u> at 759, n.3.

Defendant does not contest that Ellis can satisfy her burden of establishing a <u>prima facie</u> case for retaliation.[14]  Instead, Defendant argues that their legitimate business reason

---

be no claim of a breach of implied covenant of good faith and fair dealing.  <u>See</u> <u>Noye v. Hoffman LaRoche</u>, 238 N.J. Super. 430, 433 (App. Div. 1990).  Thus, Counts VII and VIII fail as a matter of law.

[13]With respect to the retaliation claim, Defendant argues that Ellis failed to exhaust her administrative remedies by failing to include her claim of retaliation in her EEOC charge or her DCR charge.  As indicated earlier in this Opinion, the Third Circuit liberally construes the exhaustion requirement, which was reconfirmed in the recent Supreme Court case <u>Fed. Express Corp. v. Holowecki</u>, 128 S. Ct. 1147 (2008) ("Documents filed by an employee with the Equal Employment Opportunity Commission should be construed, to the extent consistent with permissible rules of interpretation, to protect the employee's rights and statutory remedies").  Although Ellis did not expressly reference the retaliation claim on her charges with the EEOC or the DCR, the Court finds that the allegations of retaliation in this matter were fairly within the scope of the her EEOC complaint.

[14]Ellis has satisfied her <u>prima facie</u> case for retaliation.  First, there is no dispute that Ellis engaged in a protected activity, i.e., requesting accommodation.  Nor is there

for terminating Ellis was based upon the fact that Ellis was unable to fulfill the essential functions of her job rather than the fact that she requested accommodations. Ellis proffered no evidence to discredit Defendant's reasons. While the Court recognizes that the issue of whether Ellis could fulfill the essential functions of her position is a fact question, the intent of Defendant to terminate her was based upon on its belief that Ellis could not perform her duties as a Quality Engineer. Ellis has failed to rebut such reasoning. Accordingly, Defendant's request for summary judgment on Ellis' retaliation claim is granted.

## CONCLUSION

For the reasons set forth above, summary judgment is denied as to all parties with respect to Plaintiff's failure to accommodate claim under the ADA; specifically, whether Ellis is "actually disabled" pursuant to the ADA. However, the Court finds that Defendant failed to engage in the interactive process. Moreover, summary judgment is granted to Ethicon on Plaintiff's breach of contract claim, breach of implied covenant of good faith and fair dealing claim; and retaliation claim. Summary Judgment is also granted to J&J.

DATED: March 28, 2008

                                                    /s/   Freda L. Wolfson
                                                    Freda L. Wolfson, U.S.D.J.



dispute that Ellis suffered an adverse employment action, i.e., termination. Finally, because Ellis was terminated during the interactive process, a casual link between the request for accommodation and the termination can be inferred. Kaufer v. UPMC Health Plan, Inc., No. 04-1325, 2006 WL 1984636, at *3 (W.D. Pa. Jul. 13, 2006).