**\*NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| THERESA M. ELLIS and SCOTT A. ZUKOWSKI, w/h, | : | |
| | : | |
| Plaintiffs, | : | Civil Action No. 05-726(FLW) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| ETHICON, INC., JOHNSON & JOHNSON, INC., and JOHN DOE(S) | : | |
| | : | |
| Defendants. | : | |

<u>**WOLFSON, District Judge**</u>:

A jury has rendered its decision and found that Defendant Ethicon, Inc. ("Defendant" or "Ethicon"), Plaintiff's former employer, violated the Americans with Disabilities Act ("ADA") by failing to provide reasonable accommodations to Plaintiff Theresa Ellis ("Plaintiff" or "Ellis") in light of her cognitive disability. Now, after the trial, Defendant moves for judgment under <u>Fed. R. Civ. P.</u> 50(b) or, in the alternative, for a new trial under Rule 59. In arguing that the verdict is contrary to the evidence presented at trial, Defendant confines its argument to three particular points: (1) Ethicon did not fail to engage in the interactive process; (2) Ellis was not disabled under the ADA; and (3) Ellis was not qualified to perform the essential functions of her job at Ethicon. Plaintiff opposes the motion and cross-moves to alter or amend the judgment with respect to equitable remedies pursuant to Rule 59(e). For the reasons that follow, Defendant's motion is DENIED and Plaintiff's motion is DENIED. In addition, the

Court shall award Plaintiff back pay in the amount of $42,400[1] and reinstate Ellis' employment at Ethicon as a quality engineer, or a comparable position.

## BACKGROUND AND PROCEDURAL HISTORY

The Court will only briefly summarize here Ellis' work and medical history while she was employed by Ethicon.   Ellis began employment with Ethicon in September 1997 as a Senior Quality Assurance Engineer.    In January 1999, Ellis was involved in an automobile accident on her way to work.   After being diagnosed with cervical strain, Ellis was placed on disability by her doctor as of January 7, 1999, and went on a short-term disability.   Thereafter, Ellis returned to work.

Ellis worked without any restrictions and without incident from September 1999 until April 2001.   In April 2001, Ellis started to complain of dizziness, pain and inability to concentrate.   Dr. John Mahon, a neurologist, diagnosed Ellis with post concussion syndrome and a mild traumatic brain injury stemming from the 1999 car accident.   Dr. Mahon also referred Ellis to a neuropsychiatrist, Dr. Barbara Watson, for an evaluation. After rounds of testing, Dr. Watson recommended that Ellis work in an accommodated work environment, e.g., short-term disability, reduction of hours and responsibilities, and/or an accommodated work environment.   Based on Dr. Watson's report and Dr. Mahon's recommendation, Ellis began a second period of short-term disability on April 23, 2001.

Defendant contests the jury's verdict with respect to its participation in the interactive process regarding Plaintiff's intended return to work plan following her

---

[1] As it will be discussed later in this Opinion, this number must be converted to 2009 present value numbers.

short-term disability leave.   Below is a timeline of what transpired in the weeks before Ellis' short-term disability period ended:

1. On October 5, 2001, Dr. Watson spoke to Melissa Stretch, a Kemper nurse coordinator who was responsible for administering Ethicon's disability benefits, regarding Ellis' return to work recommendations.   Specifically, Dr. Watson recommended, <u>inter alia</u>, that Ellis should work three days from home and that a job coach should be provided for a successful return to work.   Dr. Watson also recommended a detailed gradual return to work plan.   <u>See</u> P175; May 7 Tr., 32-41.

2. On October 15, 2001, Kemper received a letter and a Return to Work release from Dr. Mahon which also enclosed the evaluation from Dr. Watson.   In the letter, Dr. Mahon stated that the limitations listed in Dr. Watson's recommendations would need to be maintained indefinitely.   <u>See</u> D50; May 6 Tr., 73-74.   While the parties disputed at trial the duration of Ellis' disability, Ethicon insisted that Ellis' limitations due to her cognitive impairments were represented as being permanent in nature.   In that regard, Lisa Warren, Ethicon's in-house counsel, testified during the trial that due to the permanency of Ellis' accommodations, Ethicon was unable to accept the doctors' recommendations.[1]   <u>See</u> May 14 Tr., 5-6 ("Ethicon was not able to accommodate the three days a week from home, two days in the office permanent restriction that was requested from her physician").

3. Ellis' attorneys from the law firm of Carella Byrne continued discussions with

---

[1]The relevant testimonies will be recited in detail later in this Opinion.

3

Ethicon regarding Plaintiff's accommodations.   <u>See</u> May 14 Tr., 15-20. Specifically, on October 19, 2001, Ellis' then-attorney, Nicola Hadziosmanovic ("Nicola H."), sent a letter to Ms. Warren addressing return to work issues. D-54; May 12, 92-93.

4. After Ellis' second short-term disability period ended on October 21, 2001, she was automatically rolled into the long-term disability ("LTD") program, which effectively terminated Ellis.   <u>See</u> May 14 Tr., 7-9.

5. On October 31, 2001, Ms. Warren offered Plaintiff, through Nicola H., a part-time position, instead of agreeing to accommodate Ellis by allowing her to work three days a week from home.   <u>See</u> May 14 Tr., 15-20.   Ms. Warren informed Nicola H. that Ethicon would be willing to consider other alternatives if Ellis' doctor provided Ethicon with revised accommodations. <u>See</u> May 12 Tr., 139-40.

6. On November 13, 2001, Ms. Warren spoke with Nicola H. and Nicola H. informed her that Ellis had rejected the part-time position.   May 14 Tr., 140-42.   Nicola H. also requested a meeting to "iron out accommodations." <u>Id.</u>   Ms. Warren again advised Nicola H. that "plaintiff [had to] get revised accommodations from her doctor and then [they] could sit down with her manager (Ms. Traver)."   <u>Id.</u> at 143. However, Ellis never sent revised accommodations as requested.

7. Subsequent to Ellis' termination, Ellis secured a position at Aventis, where she worked from December 17, 2001 to August 2004 without accommodation. However, Ellis took another short-term disability during that time period,

from November 5, 2003 to March 28, 2004.

8. On December 31, 2001, Ms. Warren, during a telephone conversation with Ellis' husband, learned that Ellis had started a new job and was informed that Ellis was not aware that Ethicon had offered her a part-time position.  <u>See</u> P179.

At trial, the parties disputed each other's participation in the interactive process. After almost two weeks of trial, the jury found, in special verdict interrogatories, that, with respect to Ellis' ADA claim, Ellis proved by a preponderance of the evidence that in October 2001, she was substantially limited in the major life activity of cognitive function, and therefore, she was disabled under the ADA; that she was qualified to perform the essential functions of her job as a quality engineer with or without accommodations; that Ethicon unreasonably failed to provide the accommodations requested by Ellis or any other reasonable accommodations; and that accommodating Ellis in her job as a quality engineer would not have been an undue hardship.  <u>See</u> Verdict Sheet, 1-2.

In addition, in its advisory verdict, the jury found that Ellis proved that she suffered a loss of wages between October 21, 2001 and today; that Ethicon was a cause of Ellis' short-term disability at Aventis from November 5, 2003 to March 28, 2004; and that Ethicon was a cause of Ellis' disability which resulted in Ellis leaving Aventis in August 2004.  However, the jury also found that Ethicon proved that Ellis failed to mitigate her damages.  In light of those findings, the jury recommended that Ellis receive $311,200 in back pay if Ethicon was partially liable for causing Ellis' disability at Aventis, or $486,250 if Ethicon was fully responsible.  <u>See</u> <u>Id.</u> at 4-5.  With respect to

front pay, the jury found that Ellis is currently able to work with or without accommodations, and recommended an award of $734,000.  See Id. at 6.

Now, Defendant moves for judgment notwithstanding the verdict, or in the alternative, a new trial.  In response, Plaintiff moves to amend or alter the judgment with respect to damages.  In the first part of the Opinion, the Court will discuss Defendant's motion.   In the second part, the Court will supplement any additional facts necessary to adjudicate Plaintiff's motion.

## DISCUSSION

I.     **Defendant's Motion for Judgment as a Matter of Law or in the Alternative a New Trial**

A.     **Judgment as a Matter of Law**

Federal Rule of Civil Procedure 50 states, in pertinent part:

(a) Judgment as a Matter of Law.

> (1) If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

> (b) Renewing Motion for Judgment After Trial; Alternative Motion for New Trial. If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment--and may alternatively request a new trial or join a motion for a new trial under Rule 59. . . .

See Fed. R. Civ. P. 50(a).  Similar to the summary judgment standard, the reviewing

6

court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150 (2000); Goodman v. Pennsylvania Turnpike Comm'n, 293 F.3d 655, 665 (3d Cir. 2002).   Generally, a Rule 50 motion should be granted only if evidence is not sufficient for a jury reasonably to find liability.   Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993).   Although judgment as a matter of law should be granted sparingly, a scintilla of evidence will not enable the non-movant to survive a Rule 50 motion.   See Id.   "The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." Id. (internal quotation omitted).   In other words, the key to surviving a Rule 50 motion is a legally sufficient evidentiary basis for the verdict.   Goodman, 293 F.3d at 665.   The Third Circuit has cautioned that the test for prevailing on a Rule 50(b) motion is a stringent one because it implicates the right to a trial by jury embodied in the Seventh Amendment.   Watcher v. Pottsville Area Emergency Med. Servs., 248 Fed. Appx. 272, 280 (3d Cir. 2008).

### B.   New Trial

This Court may order a new trial if it is required to prevent injustice or to correct a verdict that was contrary to the weight of the evidence. American Bearing Company, Inc. v. Litton Industries, Inc., 729 F.2d 943, 948 (3d Cir. 1984); Radwan v. Carteret Bd. of Educ., 62 Fed. Appx. 34, 37-38 (3d Cir. 2003).   The decision to grant or deny a new trial is left almost entirely to the discretion of the district court. Allied Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 36 (1980); Blancha v. Raymark Industries, 972 F.2d 507, 512

(3d Cir. 1992). A new trial should be granted based upon a verdict being against the weight of the evidence only "where a miscarriage of justice would result if the verdict were to stand." Williamson  v. Consolidated Rail Corp., 926 F.2d 1344, 1352 (3d Cir. 1991). The purpose of this rule is to ensure a court does not replace the jury verdict with one based upon its own interpretation of the facts. Olefins Trading, Inc. v. Han Yang Chem. Corp., 9 F.3d 282, 290 (3d Cir. 1993). "Such an action effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if [s]he does not usurp, the prime function of the jury as the trier of the facts." Lind v. Schenley Industries Inc., 278 F.2d 79, 90 (3d Cir.1960) (en banc).

### C.    Interactive Process

As noted above, Defendant raises several issues with respect to the jury's determination.  Defendant contends that the jury's determination that Ethicon unreasonably failed to provide the accommodations requested by Ellis or any other reasonable accommodations cannot be reconciled with the evidence at trial.  Defendant vigorously maintains that Ethicon participated in good faith in the interactive process and that the process was ended by Ellis, not Ethicon.  Therefore, Defendant argues, because of Ellis' failure to participate in that process, the jury's judgment in this respect is against the weight of the evidence.  The Court finds this argument unconvincing. However, before embarking upon a discussion of the pertinent evidence presented at trial, it is incumbent upon the Court to again elucidate in detail the requirements of the interactive process in this circuit.

The starting point is the ADA's regulations which state that: "To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate

an informal, interactive process with the [employee] in need of accommodation. This process should identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3); Taylor v. Phoenixville Sch. Dist. 184 F.3d 296, 317 (3d Cir. 1999).   This concept is further supported by the Equal Employment Opportunity Commission's ("EEOC") interpretive guidelines, which provide that: "Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." 29 C.F.R. Pt. 1630, App. § 1630.9 at 359.

These authorities form the basis for the Third Circuit's rulings on the interactive process. See Taylor, 184 F.3d at 317-18 ("Based on the regulation and interpretive guidelines, we held in Mengine that "both parties have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith" (citations and quotations omitted)).   Exploring sister circuits, the Third Circuit has found persuasive authorities buttressing the framework of the interactive process.   These circuits, including this circuit, are in agreement that engaging in the interactive process is a "mandatory rather than a permissive obligation on the part of employers under the ADA," and that "once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation."   Taylor, 184 F.3d at 311; see, e.g., Beck v. University of Wisconsin Bd. of Regents, 75 F.3d 1130, 1135 (7th Cir. 1996)("A party that obstructs or

delays the interactive process is not acting in good faith; a party that fails to communicate, by way of initiation or response, may also be acting in bad faith"); Taylor v. Principal Financial Group, Inc., 93 F.3d 155, 165 (5th Cir. 1996)(The "employee's initial request for an accommodation... triggers the employer's obligation to participate in the interactive process...").

To this end, the Third Circuit is clear in its mandate that an appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the employee with a disability. Taylor, 184 F.3d at 311 (citations omitted); see generally, Hohider v. UPS, 574 F.3d 169 (3d Cir. 2009). It is not fatal to the employee's claim that the employee requests an accommodation that is not reasonably feasible. "The interactive process, as its name implies, requires the employer to take some initiative." Id. at 315. This process would be meaningless "if it was interpreted to allow employers, in the face of a request for accommodation, simply to sit back passively, offer nothing, and then, in post-termination litigation, try to knock down every specific accommodation as too burdensome." Id. In short, "an employer who has received proper notice cannot escape its duty to engage in the interactive process simply because the employee did not come forward with a reasonable accommodation that would prevail in litigation." Id. at 317.

It is important to note that "the interactive process does not dictate that any particular concession must be made by the employer; nor does the process remove the employee's burden of showing that a particular accommodation rejected by the employer would have made the employee qualified to perform the job's essential functions." Id. at 317 (citing Walton v. Mental Health Association of Southeastern Pennsylvania, 168 F.3d

661, 670 (3d Cir. 1999)).   All the interactive process requires is that employers make a good-faith effort to seek accommodations.   Id.   The Third Circuit has consistently admonished that "an employer who fails to engage in the interactive process runs a serious risk that it will erroneously overlook an opportunity to accommodate a statutorily disabled employee, and thereby violate the ADA." Deane v. Pocono Med. Ctr., 142 F.3d 138, 149 (3d Cir. 1998)(en banc); Hohider, 574 F.3d at 193-94; see also Armstrong v. Burdette Tomlin Mem'l Hosp., 438 F.3d 240, 246-47 (3d Cir. 2006)("[i]f an 'employee could have been reasonably accommodated but for the employer's lack of good faith', the employee will win on his failure to accommodate claim" (citations omitted)).

Conversely, an employer is not liable if the employee fails to supply it with information necessary to devise an appropriate accommodation, or if the employee "'does not answer the employer's request for more detailed proposals.'"   Whelan v. Teledyne Metalworking Prods., 226 Fed. Appx. 141, 146 (3d Cir. 2007)(quotations and citations omitted).   Of course, an employee also may not unreasonably insist on a single accommodation; this type of insistence would deem the employee at fault for breaking down the interactive process.   Id.

At trial, an employee can establish that an employer failed to engage in the interactive process in good faith by showing that: (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith. Williams v. Phila. Hous. Auth.

Police Dep't, 380 F.3d 751, 772 (3d Cir. 2004) (quotation omitted).   On the other hand, an employer can show good faith by "meet[ing] with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered employee's request, and offer and discuss available alternatives when the request is too burdensome." Id.   The EEOC also obligates the employer to: (1) analyze the particular job involved and determine its purpose and essential functions; (2) consult with the disabled employee to understand her precise job-related limitations and how they could be overcome with a reasonable accommodation; (3) in consultation with the disabled employee, identify potential accommodations; and (4) considering the preference of the individual to be accommodated, select and implement the most appropriate accommodation. 29 C.F.R. Pt. 1630, App. § 1630.9.

As a preliminary matter, the Court previously rejected Plaintiff's argument that as a matter of law Defendant discontinued the interactive process by allowing Ellis to roll into the LTD program – which effectively terminated Ellis – after her short-term disability benefits period ended.   The Court reasoned that the process of being rolled into the LTD program is automatic; Ethicon did not affirmatively act to terminate Ellis' position, but rather, passively enrolled Ellis into the LTD program pursuant to policy.   It might be a different result if Ethicon actively terminated Ellis, and then, in an attempt to ward off litigation, offered her another position.   Thus, the Court reserved the determination -- whether the interactive process continued post-termination -- for the factfinder.   See June 3, 2008 Reconsideration Opinion at 7-8.   The Court also rejected the position that any attorney-to-attorney discussion cannot be a part of the interactive

process. See Ellis v. Ethicon, Inc., No. 05-726, 2008 U.S. Dist. LEXIS 27202, at *57 (D.N.J. Mar. 28, 2008); Burke v. Iowa Methodist Medical Center, No. 99-30634, 2001 U.S. Dist. LEXIS 21126, at *17-18 (S.D. Iowa Feb. 22, 2001).   Now, the Court will turn to Defendant's contentions.

As for the first element - whether Ethicon knew about Ellis' disability - the witnesses' testimony establish, and Ethicon does not dispute on this motion, that Ethicon was aware of Ellis' cognitive impairments.   Ellis also requested accommodations before the end of her short-term disability period.   In particular, Dr. Mahon and Dr. Watson recommended that Ellis work from home three days a week and work in the office two days a week.   See May 6 Tr., 73-74.   This request duly satisfies the second element which requires Ellis to show that she requested accommodations for her disability; this, too, was not disputed by Ethicon.   Similarly, Defendant does not raise the issue of whether Ellis could have been accommodated absent bad faith.

Instead, Defendant takes issue with Plaintiff's proof with respect to the third element - whether Ethicon participated in the interactive process in good faith.   In that connection, Defendant submits that the evidence overwhelmingly supports the conclusion that Ethicon continued to engage in the interactive process in good faith until Ellis ended it.   For support, Defendant cites testimony from Ms. Warren that Plaintiff's initial proposed accommodation of working three days from home was considered and rejected by Ethicon based on the statement in Dr. Mahon's letter that the restriction was permanent and indefinite.   Defendant also points to the testimony of Ms. Traver, Plaintiff's then-supervisor, that such accommodation was not feasible based on the understanding that working from home three days a week was not consistent with the

job requirements for a quality engineer. <u>See</u> May 11 Tr., 174-77; May 15 Tr., 3-5.  In light of that understanding, Defendant argues that Ms. Warren's testimony was unrebutted and establishes the fact that Ellis ended the interactive process when she failed to continue discussions after a part-time position was offered to Ellis' attorney, and thus, the jury's finding that Ethicon failed to engage in the interactive process cannot be reconciled with the evidence.

Defendant's argument is reminiscent of the contention made in its motion for reconsideration prior to trial.  Then, the Court entertained the exact issue raised here. At that time, the Court was of the opinion that there were genuine issues of fact with regard to the parties' involvement in the interactive process subsequent to the proposal of a part-time position by Ethicon which had to be resolved by the factfinder at a trial. <u>See</u> June 3, 2008 Reconsideration Opinion.  The facts of this case were fully considered by the jury and a finding was made that Ethicon failed to provide Ellis with reasonable accommodations.  Contrary to Defendant's contention, the jury's finding is amply supported by the evidence presented at trial when viewed in the light most favorable to the verdict.

Ms. Warren's testimony, with respect to the discussions between Ellis' attorney, Nicola H., and Ms. Warren herself, does not compel the conclusion that Defendant engaged in the interactive process in good faith.[2]  In terms of a time-line, Ms. Warren

---

[2]

Defendant cites to Third Circuit cases that stand for the proposition that a plaintiff cannot meet her burden of proof on an issue merely by disbelief of defendant's evidence. <u>See</u>, <u>e.g.</u>, <u>Schoonejongen v. Curtiss Wright</u>, 143 F.3d 120, 130 (3d Cir. 1998); <u>Williams v. Borough of West Chester, P.A.</u>, 891 F.2d 458, 460 (3d Cir. 1989).  However, those cases were decided on a summary judgment motion whereby the Third Circuit cautioned that a

testified that Ethicon received a letter from Dr. Mahon proposing that accommodations should be made in order for Ellis to work from home three days a week.  See May 12 Tr., 138-39.  Ms. Warren testified that she spoke with Ellis' supervisor, Ms. Traver, who advised her that Ethicon would not be able to provide the requested accommodation due to certain job requirements of a quality engineer.  Id.  This determination was communicated to Ellis by way of an email on October 15, 2001.  See May 6 Tr., 74-78; P-92.  Ms. Warren acknowledged that on October 18, 2001, she received a call from Nicola H. to address Ellis' return to work.  See May 12 Tr., 136-37.  Ms. Warren further acknowledged that a letter was sent by Nicola H. on behalf of Ellis on October 19, 2001, discussing generally Ethicon's rejection of Ellis' proposed accommodations.  See D-54. Having received the letter, Ms. Warren testified that she spoke with Ms. Traver and determined that Ellis was a valued employee and that Ethicon would be willing to permit Ellis to work on a part-time basis.  Id. at 140.  According to Ms. Warren, this proposal of a part-time position was communicated to Nicola H. during a telephone conversation on October 31, 2001.  Id.

Thereafter, on November 13, 2001, Ms. Warren testified that Nicola H. asked about other alternative accommodations because Ellis was not interested in a part-time position.  Id. at 141.  In response, Ms. Warren advised Nicola H. that Ethicon would

---

plaintiff cannot survive summary judgment simply by asserting that the factfinder might disbelieve the testimony of defendant's witnesses.  Hozier v. Midwest Fastener, Inc., 908 F.2d 1155, 1165 (3d Cir. 1990).  Here, however, a jury has heard and considered all the testimony.  Indeed, it is the jury's role to weigh credibility and to determine whether to believe or discredit, in part or whole, a witness' testimony.  See United States v. Wise, 515 F.3d 207, 214 (3d Cir. 2008)("we 'must be ever vigilant ... not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [our] judgment for that of the jury'" (quoting United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005)).

require revised accommodations from Ellis' physicians. <u>Id.</u> During this telephone call, Nicola H. also requested a meeting with Human Resources, Ethicon's medical personnel, and Ellis' doctor to "iron out accommodations." <u>Id.</u> at 142. Despite such a request, Ms. Warren reiterated that before Ethicon would take any steps, it would need "revised accommodations from [Ellis'] doctor." <u>Id.</u> However, Ms. Warren also indicated that Ethicon would be willing to consider "whatever [Ellis'] doctor was willing to permit her to do," as long as it was "within the parameters of the business they were trying to run." <u>Id.</u> at 143-44.

Ms. Warren further testified that she did not hear anything back from Nicola H. regarding any revised accommodations. Rather, at the end of December of 2001, Ms. Warren received a call from Ellis' husband, Scott Zukowski, and he advised Ms. Warren that his wife was not aware that a part-time position had been offered, and that Ellis was not interested since she had started another job. <u>Id.</u> at 154. Based on Ms. Warren's testimony, Defendant argues that Ethicon did in fact engage in the interactive process in good faith, and that it was Ellis that ended the process by failing to provide additional accommodations from her doctor, and subsequently, secured another job.

Whether Ethicon participated in the interactive process in good faith is a fact sensitive inquiry that requires the factfinder to look at the totality of the circumstances. See <u>O'Dell v. Dep't of Pub. Welfare</u>, No. 02-130, 2004 U.S. Dist. LEXIS 23585, at *19-20 (W.D. Pa. Nov. 14, 2004)("the Third Circuit underscores the factually-sensitive determinations [of the interactive process] to be made on a case-by-case basis . . .; it is the role of the fact-finder to determine the reasonableness of the accommodation"). No one aspect of the process is determinative of good or bad faith. <u>Johnson v. McGraw-Hill</u>

Cos., 451 F. Supp. 2d 681, 711 (W.D. Pa. 2006); EEOC v. Sears, Roebuck & Co., 417 F.3d 789, 805-06 (7th Cir. 2005)("[t]he last act in the interactive process is not always the cause of a breakdown, however, and [the] court must examine the process as a whole to determine whether the evidence requires a finding that one party's bad faith caused the breakdown").   In light of those principles, the Court disagrees with Ethicon's insistence that the jury could not have found bad faith in Ethicon's rejection of Ellis' initial proposal for accommodations.   Indeed, the first finding of bad faith could have been based on Ethicon's absolute rejection of Ellis' initial proposed accommodations without seeking any explanation from Ellis and her doctors, or exploring other alternative accommodations.    In fact, the jury heard Dr. Waston's testimony that the accommodation of working three days a week from home was not permanent in nature at the time when it was proposed.   Dr. Watson qualified her recommendations by stating that based upon Ellis' impairments and progress, the accommodations might be permanent. See May 7 Tr., 33-36; 39-40.   In any event, no one from Ethicon contacted Dr. Watson, or Dr. Mahon, about the proposed accommodations.    Id. at 34. Significantly, Ms. Traver testified that if she had known that the proposed accommodations were not permanent, but presented "as transient and progressive toward full return to work," she would have been willing to have a discussion with Ellis regarding a gradual return to work plan.   May 11 Tr., 128-132; 152.   However, Ellis' proposed accommodations were rejected without any further action on Ethicon's part. The evidence supports a finding that after Ethicon received the proper notice from Ellis, Ethicon ignored its duty to engage in the interactive process simply because it believed Ellis had not come forward with a reasonable accommodation.   See Taylor, 184 F.3d at

317.   Instead, it was not until Ellis' attorney contacted Ms. Warren that the conversation regarding Ellis' return-to-work plan resumed.[3]

Likewise, Ethicon's failure to propose alternative accommodations once Ellis rejected the part-time position supports the jury's finding of bad faith.  Ms. Warren testified that a return-to-work meeting never occurred because Ellis failed to provide revised accommodations from her doctors.   Ethicon maintains that it was not obligated under the ADA to negotiate Ellis' medical restrictions before addressing possible accommodations.   The crux of Ethicon's defense at trial was that it should not be faulted for Ellis' failure to answer Ethicon's request for more detailed proposals; this failure on Ellis' part should have relieved Ethicon from providing any further offers of reasonable accommodations. However, despite Ethicon having presented evidence on this issue and so arguing to the jury, the jury nonetheless rejected this position in ruling against Defendant, and the record supports the jury's determination.

The interactive process obliges an employer to make a reasonable effort to determine the appropriate accommodation.   To that end, Ethicon's perception that the accommodations Ellis proposed were impractical for business reasons did not relieve

---

[3]

In further arguing that Ethicon's conduct was unreasonable, Plaintiff points to the return-to-work interactive process during her first short-term disability leave in 1999 and compares it to the process in 2001.   In doing so, Plaintiff argues that a return-to-work meeting with Ethicon never occurred in 2001, even though there was a meeting in 1999; therefore, Ethicon's failure to hold such a meeting is evidence of bad faith.   Plaintiff's comparison is misplaced.   During the trial, the Court specifically instructed the jury that the testimony regarding Plaintiff's return-to-work process following her short-term-disability leave in 1999 can only be considered as evidence of Plaintiff's state of mind as to her expectations.   Furthermore, the jury was instructed not to conclude from this evidence that all return-to-work situations are the same.   See May 5. Tr., 88.   In addition, an in-person meeting is not the only way to engage in the interactive process.

Ethicon of its obligation to discuss possible accommodations that were available and appropriate.  See  Canny v. Dr. Pepper, 439 F.3d 894, 903 (8th Cir. 2006)("Dr Pepper's perception that the accommodations Canny suggested were impractical did not relieve Dr Pepper of its obligation to discuss possible accommodations that were available and appropriate"); Humphrey v. Memorial Hospitals Assoc., 239 F.3d 1128, 1138 (9th Cir. 2001)("MHA's rejection of Humphrey's work-at-home request and its failure to explore with Humphrey the possibility of other accommodations, once it was aware that the initial arrangement was not effective, constitutes a violation of its duty regarding the mandatory interactive process").   Notwithstanding the part-time position, which was at odds with the recommendations of Ellis' doctors,[4] Ethicon never apprised itself of Ellis' medical condition and/or suggested alternative accommodations that would comport with the proposed accommodations suggested by Ellis' doctors.   More importantly, "the ADA was enacted to compel employers to look deeper and more creatively into the various possibilities suggested by an employee with a disability." Skerski v. Time Warner Cable Co., 257 F.3d 273, 285 (3d Cir. 2001).   Based upon the evidence, the jury could have found that a reasonable accommodation within Ellis' position was possible and that Ethicon failed to explore alternative accommodations that would have enabled Ellis to retain her full-time status.  Id.  ("'an employer may reassign an individual to a lower graded position if there are no accommodations that would enable the employee to remain in the current position and there are no vacant equivalent positions for which the

_____

[4]Indeed, the part-time position was not comparable to Ellis' full-time position. Importantly, the jury heard testimony that the position would have paid less and that short-term disability benefits are not available for part-time employees.  See May 14 Tr., 27.

individual is qualified with or without reasonable accommodation.'" (quoting EEOC Interpretive Guidance, 29 C.F.R. pt. 1630, App. 1630.2(o)).

Defendant next argues that Plaintiff never provided the medical information Ethicon requested because Plaintiff was "not interested" in returning to Ethicon as evidenced by the fact that Plaintiff took a job at Aventis.   However, Plaintiff's employment at Aventis in December 2001 does not excuse Defendant's responsibility under the ADA.   Moreover, the jury heard testimony from Ellis that she sought employment with Aventis in December 2001 because at that time she was already terminated from Ethicon and she was under the impression that Ethicon was unwilling to accommodate her disability.[5]  See May 5 Tr., 156-57.  Certainly, it was within the jury's province to weigh the credibility of Plaintiff on this issue.

The Court also finds Defendant's attorney-client privilege argument without merit.  Throughout the trial, Defendant argued that it was prejudiced by Plaintiff's abuse of the attorney-client privilege with respect to certain communications between Ellis and the Carella Byrne attorneys.  Specifically, Defendant repeatedly complained that while Ellis and her husband denied knowledge of the key communications that had occurred regarding Ethicon's offer of a part-time position, the Court disallowed Defendant from exploring and impeaching these general denials on cross-examination of Plaintiff or on the examination of Ms. Flax, one of Ellis' attorneys from Carella Byrne.

---

[5] It is certainly plausible that Ellis believed Ethicon was unwilling to accommodate her in December 2001.  The jury heard testimony regarding Ellis' first short-term disability period at which time Ethicon actively participated in the interactive process.  Ellis testified that she expected similar treatment in 2001, but it never took place.  May 5 Tr., 88-95, 144-147.

As a result, Defendant surmises that the jury was led to conclude that Ellis did not know about the part-time offer or Ethicon's willingness to consider other restrictions and to continue the interactive process.   Defendant's reasoning fails to take into account the jury instruction that addressed this exact issue.   The Court charged the jury that communications between attorneys are to be treated the same as if the communications had occurred between the parties since attorneys are the agents of their client. Therefore, Ellis was deemed to have knowledge of the part-time position since it was offered to her attorney.   Thus, Defendant's disagreement with the Court's evidentiary ruling is without merit on this motion.

Accordingly, based upon the totality of the circumstances surrounding Ellis' second short-term disability period, there was sufficient evidentiary basis for the jury's determination that Ethicon failed to provide reasonable accommodations to Plaintiff and failed to engage in the interactive process to find such accommodations.

### D.   Qualified Individual

Next, Defendant argues that Plaintiff failed to prove that she could have been reasonably accommodated in a way that would have enabled her to perform the essential functions of a quality engineer.   Defendant advances that Plaintiff's own testimony - that she could have performed the essential functions of her job by temporarily working three-days a week from home - was contradicted by Dr. Watson's prognosis that the proposed restrictions were "permanent" and "indefinite."   In addition, Defendant faults Plaintiff for her failure to prove that such a temporary accommodation would have been consistent with the essential functions of the job.

Under the ADA, a "qualified individual" is one "who, with or without reasonable

accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); <u>Skerski</u>, 257 F.3d at 278.   To satisfy this requirement, a plaintiff must first show that she "satisfies the requisite skill, experience, education and other job-related requirements of the employment position that such individual holds or desires." <u>Deane</u>, 142 F.3d at 145.   Second, a plaintiff must demonstrate that she, "with or without reasonable accommodation, can perform the essential functions of the position held or sought."   <u>Id.</u>   There is no dispute as to the first part of this analysis as the evidence readily establishes, and Ethicon does not controvert, that Ellis possessed the skills and experience necessary to perform the duties of a quality engineer.   <u>See</u> May 12 Tr., 5 (Traver: "Theresa was a very good quality engineer.   She was a strong performer.   She has great credentials and skills, very technically competent . . .").   Rather, Defendant's contention here relates to the latter question.

Turning to this second question requires the Court to conduct a two-part inquiry. The first determination is whether Ellis can perform the essential functions of her job without accommodation.   <u>Skerski</u>, 257 F.3d at 278.   If this is the case, Ellis would be considered a "qualified individual," thereby satisfying the second part of a <u>prima facie</u> case under the ADA.   <u>Id.</u>   If Ellis cannot perform the essential functions of her job as a quality engineer without accommodation, then the inquiry is whether she can perform those same functions with a reasonable accommodation. Similarly, if she is able to perform with accommodations, she will be considered a "qualified individual" under the ADA.   <u>Id.</u> at 278-79.

At trial, the jury heard testimony from Ms. Traver that Ellis could not have

performed the essential functions of a quality engineer by working at home three days a week because she needed to meet in person with other team members to facilitate the development of new products.  See May 12. Tr., 3.   In addition, as a quality engineer, Ellis was occasionally required to travel to off-site locations.[2]   However, Ms. Traver also testified that she was willing to accommodate Ellis by allowing her to work from home three days a week on a temporary basis. Id. at 4.   In order to do so, Ellis' duties would be reassigned to another member of the engineering staff.  Ms. Traver pointed out that these duties were the essential functions of Ellis' position.   In that regard, Defendant argues that even with accommodations, Ellis could not have performed the essential functions of her job because some of her essential duties had to be reassigned.  However, this ignores other evidence in the record that would provide a sufficient evidentiary basis for the jury to find that Ellis was a qualified individual.

Without doubt, there was a great deal of evidence suggesting that with accommodations, Ellis was able to perform her job.  In her testimony, Ms. Traver agreed that a portion of Ellis' position is report writing and data analysis which could be done from a remote location.  Id. at 11.   In addition, from a remote location, Ellis could have contacted other staff members via telephone, email, and conceivably, video conferencing.  Id.  Ms. Traver also agreed that if there had been an opportunity to discuss the accommodations and work on a gradual reentry into the workplace, she would have been able to place Ellis back into her job, albeit some of the duties would be

---

[2] Ellis testified that during the period between her return from the first short-term disability and her second short-term disability, she only had to travel one day for work to a nearby company close to where she lived, and that she did not have to travel by airplane.  See May 5 Tr., 104.

23

temporarily assigned to other engineers.   In sum, Ms. Traver was of the opinion that Ellis would have been able to continue to perform her job with certain accommodations. Indeed, Ms. Traver was "willing to consider anything . . . that would have [led] [] to full functionality at the end."   Id. at 22.   In fact, Ms. Traver was even open to the idea of permitting Ellis to permanently work from home one day a week.   Id. at 21.

Dr. Watson's testimony further illustrates that Ellis was able to perform her job with certain accommodations.   The doctor testified at length that Ellis could return to work if she could work from home three days a week.   Dr. Watson reasoned that this plan would "eliminate the commute and save the wear and tear."   May 7 Tr., 35.   Ellis would be able to "use all her energy to focus on what she needed to do to get that job done, pace herself through the day."   Id.   If need be, Ellis could "take a nap at lunch for 20 minutes . . . come back to a project and think about it, . . . work a longer day at home and get the job done without interruptions, without the phone ringing . . . ."   Id. With these accommodations in place Ellis would have "had a very decent chance of being able to do her job."   Id.   In light of the testimony of the various witnesses, the jury had sufficient evidentiary basis to find that Ellis was a "qualified individual" within the meaning of the ADA.

### E.   Cognitive Impairment as a Disability

Defendant also argues that Plaintiff has failed to prove that her disability was substantially limiting in the major life activity of cognitive function as required by the ADA.   In that regard, Defendant advances similar arguments in this context as done in its motion for summary judgment - Dr. Watson's testimony only proves that Plaintiff's cognitive function was between average and below average ranges and subject to "mild

impairment" overall.

In the first instance, a determination must be made with respect to whether the individual is substantially limited in any major life activity other than working, such as walking, seeing, or hearing. 29 C.F.R. Pt. 1630, App. § 1630.2(j). In making this determination, the effect of the impairment on that individual is compared with the "average person in the general population." 29 C.F.R. § 1630.2(j)(1).   EEOC Regulation 6 provides that an individual is "substantially limited" in performing a major life activity if the individual is: (i) unable to perform a major life activity that the average person in the general population can perform; or (ii) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1); Williams, 380 F.3d at 762.

In addition, the regulations specify that the following factors should be considered in determining whether an individual is substantially limited in a major life activity: (i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and the permanent or long term impact or the expected permanent or long term impact of or resulting from the impairment. 29 C.F.R. § 1630.2(j)(2); Weisberg v. Riverside Township Board of Education, 180 Fed. Appx. 357, 361 (3d Cir. 2006). The analysis should be conducted in light of the facts that existed at the time of the alleged discrimination and not in light of conditions that developed years later. See Taylor, 184 F.3d at 308 (plaintiff must show she was substantially limited during the time span when she says she was denied reasonable accommodation).

In its argument, Defendant has merely focused on the first part of the equation - whether Ellis was unable to perform a major life activity that the average person in the general population can perform.  In doing so, it focused on Dr. Watson's testing and maintains that, at worst, Ellis' cognitive functions were within average limits despite the fact she is mildly impaired.  However, Ethicon seemingly missed the second aspect of the substantially limiting test: substantially limiting can also be defined as a limitation that is significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

Previously, the Court found that while Dr. Watson's testing had shown that Ellis' abilities fell between average to below average, it was the opinion of both Dr. Mahon and Dr. Watson that because of Ellis' symptoms from her head injury, she was unable to continue at the pace she had been working at Ethicon prior to her short-term disability leave and that her hours and responsibilities at work must be reduced, followed by an accommodated work environment.  At trial, Dr. Watson elaborated on this finding. See generally, May 7, Tr., 30-41.  Dr. Watson testified that mild traumatic brain injury could result in physical manifestations of fatigue, gait, instability, dizziness, problems with balance, and blurry and double vision.  See May 3 Tr., 16.  Because of these symptoms, Ellis experienced so called "cognitive fatigue."  Id.  "That is probably the most troubling and difficult symptom a brain-injured person has to cope with."  Id. Aside from the fact that Ellis would not be able to demonstrate a wide range of emotion, she would encounter problems with concentration, speed and clarity of thinking, word

retrieval and usage, memory, organizing and planning her time, spelling and reading. Id.  Overall, Dr. Watson found Ellis' condition troubling and insisted that she required certain accommodations to re-enter the job force.  Id. at 24.   Dr. Watson cautioned that "while Ms. Ellis pain, cognitive fatigue, and depression were well-controlled and managed in a testing situation, they are likely major contributors to suboptimal functioning in daily life."  Id.

Indeed, Defendant did not timely proffer its own expert.   The jury was left with Dr. Watson's testimony regarding Ellis' cognitive issues.   While a few of the test scores showed that Ellis' mental abilities were somewhat average, Ellis' difficulties at work and her medical evidence viewed in their entirety were sufficient for a reasonable trier of fact to conclude that Ellis' impairments substantially limited her cognitive functioning abilities. See Emerson v. Northern States Power Company, 256 F.3d 506, 511-12 (7th Cir. 2001)(As to the major life activity of learning, the court noted that, even though plaintiff scored within the normal limits on neuropsychological testing, her difficulties at work and her medical evidence was sufficient for a finding that her cognitive impairments substantially limited her ability to learn).

Furthermore, the "ADA requires those 'claiming the Act's protection. . . to prove a disability by offering evidence that the extent of the limitation [caused by the impairment] in terms of their own experience . . . is substantial." Toyota v. Motor Mfg., Ky., v. Williams, 534 U.S. 184, 197 (2002)(quoting Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 567 (1999)).   Ellis testified that due to her symptoms, she was unable to coordinate her personal life functions without assistance.   Specifically, Ellis stated that after her car accident, her husband had to facilitate her life skills in order for her to

function; these included planning activities such as getting dressed, taking medication, diet, rest, medical appointments, bathroom activities, hygiene, etc.  She was no longer able to do chores around the house.   In fact, Ellis testified that all she could manage to do was work and sleep.   However, Ellis insisted that she continued to work despite her conditions.   Considering the evidence as a whole, the inquiry is whether Ellis had an impairment that substantially prevented or severely restricted her from doing activities that are of central importance to most people's daily lives.   Emory v. AstraZeneca Pharms. LP, 401 F.3d 174, 180-81, 183 (3d Cir. 2005)(quotations omitted)("when significant limitations result from the impairment, the definition is met even if the difficulties are not insurmountable" (quotations and citations omitted in original)).   In light of the evidence presented at trial, there is ample evidentiary basis for the jury to have found that Ellis' cognitive functions were substantially limited.

Accordingly, Defendant's motion for judgment as a matter of law is denied.   In the same vein, the Court does not find that the verdict needs to be corrected in order to prevent a miscarriage of justice. As such, Defendant's motion for a new trial is also denied.

## II.      Damages

To begin, Plaintiff's motion addresses certain issues regarding equitable remedies, however, she mistakenly moves the Court pursuant to Fed. R. Civ. P. 59, which is invoked in order to alter or amend a judgment.   At this juncture, there is no yet any judgment on Plaintiff's entitlement to or the amount of equitable relief.   Rather, the jury verdict in this respect is only advisory in nature; however, the jury's finding of liability is

binding.[6]   <u>Pollard v. E.I. DuPont de Nemours & Co.</u>, 532 U.S. 843, 849 (2001).  In particular, judgements pertaining to back pay and front pay are remedies tried to the Court.  <u>Id.</u>  In that regard, the Court has to make separate and independent findings of fact and conclusions of law.  <u>See</u> <u>Wilson v. Prasse</u>, 463 F.2d 109, 116 (3d Cir. 1972); <u>Fed. R. Civ. P.</u> 52(a).

###    A.    Back Pay

In its advisory verdict, the jury determined that Ellis suffered a loss of wages between October 22, 2001 - the date of Ellis' termination from Ethicon - and May 21, 2009 - the date of verdict.   Specifically, the jury found that Ethicon was a cause of Ellis' short-term disability at Aventis from November 5, 2003 to March 28, 2004, and that such disability resulted in Ellis leaving Aventis in August 2004.   However, in so finding, the jury also determined that Ethicon proved that Ellis failed to mitigate her damages by failing to obtain substantially similar employment after she left Aventis.   The jury assessed back pay damages of $311,200 in the event Ethicon is only partially liable for Ellis' termination, or $486,250 if Ethicon is fully responsible.

In determining damages in an employment discrimination suit, Congress armed the courts with broad equitable powers to effectuate this "make whole" remedy. <u>See</u> 42 U.S.C. § 2000e-5(g)(1); <u>Eshelman v. Agere Systems, Inc.</u>, 554 F.3d 426, 440 (3d Cir. 2009);  <u>Franks v. Bowman Transp. Co., Inc.</u>, 424 U.S. 747, 764 (1976).   District courts are entrusted with wide discretion to "locate 'a just result'" regarding the parameters of

---

[6]
With respect to Plaintiff's claim of emotional distress, the jury found that Ellis failed to prove that Ethicon's failure to provide a reasonable accommodation and termination of her did not play a substantial role in causing Ellis to suffer emotional distress; this finding is binding on this Court.

the relief granted in the circumstances of each case.  Eshelman, 554 F.3d at 440; see also Taxman v. Bd. of Educ. of Piscataway, 91 F.3d 1547, 1565 (3d Cir. 1996)(en banc). Consistent with the chief remedial purpose of the ADA, the Court's task is "to make persons whole for injuries suffered on account of unlawful employment discrimination." Albemarle Paper Co. v. Moody, 422 U.S. 405, 418 (1975); see McKennon v. Nashville Banner Publ'g Co., 513 U.S. 352, 358 (1995); Maxfield v. Sinclair Int'l, 766 F.2d 788, 796 (3d Cir. 1985).

In exercising its discretion to fashion a remedy, district courts should, inter alia, endeavor "to restore the employee to the economic status quo that would exist but for the employer's conduct." In re Continental Airlines, 125 F.3d 120, 135 (3d Cir. 1997); see McKennon, 513 U.S. at 362.  Among the remedies, courts have awarded back pay to achieve this goal. Loeffler v. Frank, 486 U.S. 549, 558 (1988); Spencer v. Wal-Mart Stores, Inc., 469 F.3d 311, 315 (3d Cir. 2006)("[W]e have treated back pay as a form of equitable relief awarded at the discretion of the court").

In general, back pay is designed to make victims of unlawful discrimination whole by restoring them to the position they would have been in absent the discrimination. Donlin v. Philips Lighting N. Am. Corp., 564 F.3d 207, 218 (3d Cir. 2009)(citing Loeffler v. Frank, 486 U.S. 549, 558 (1988)). Section 706(g) of the Civil Rights Act of 1964 governs back pay awards in ADA cases.  Eshelman, 554 F.3d at 440 n.7.  Section 706(g) provides:

> If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice . . . the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include . . . any other equitable relief as the

> court deems appropriate . . . . Interim earnings or amounts earnable
> with reasonable diligence by the person or persons discriminated
> against shall operate to reduce the back pay otherwise allowable.

42 U.S.C. § 2000e-5(g). Moreover, the base for calculating back pay is the salary an employee would have received but for a violation of the law, Watcher, 248 Fed. Appx. at 276, and uncertainties are resolved against a discriminating employer. Durham Life Ins. Co. v. Evans, 166 F.3d 139, 156 (3d Cir. 1999)(citations omitted).

Back pay is not an automatic or mandatory remedy, but "one which the courts 'may' invoke" at their equitable discretion. Donlin, 564 F.3d at 218(quoting Albemarle Paper Co. v. Moody, 422 U.S. 405, 415 (1975)); see also Waddell v. Small Tube Prods., Inc., 799 F.2d 69, 78 (3d Cir. 1986). "When a plaintiff finds employment that is equivalent or better than the position she was wrongly denied, the right to damages ends because it is no longer necessary to achieve an equitable purpose; the plaintiff at that point has been restored to the position she would have been in absent the discrimination." Donlin, 564 F.3d at 218.

Here, it is undisputed that Plaintiff obtained employment with Aventis beginning on December 17, 2001 after she was terminated on October 21, 2001. Defendant submits that the back pay should be limited to Ellis' short unemployment period (from October 22, 2001 to December 16, 2001) because first, Plaintiff has failed to prove that Ethicon caused her disability in 2003 and 2004 and consequent inability to continue working at Aventis and second, because Ellis failed to mitigate her damages by seeking other employment after she left Aventis. The Court will address these issues and will calculate the appropriate back pay.

### 1. Whether Ethicon's Termination was a cause of Ellis' Subsequent Disability at Aventis

First, Defendant argues that the jury's finding that Ethicon's actions did not play a substantial part in causing Ellis to suffer emotional distress foreclosed the issue of back pay.   In particular, Defendant maintains that the Court is bound by the jury's finding to the extent it overlaps with any fact issue on equitable remedies before the Court.   This argument is without merit.   The burden of proof on emotional distress is clearly set forth in this Court's jury instruction:

> Ms. Ellis has the burden of proving damages by a preponderance of the evidence.   Ms Ellis must show that she suffered emotional distress and that it would not have occurred without Ethicon's failure to provide reasonable accommodations and its termination of her. She must also show that Ethicon's act played a substantial part in bringing about the injury and that the injury was either a direct result or a reasonably probable consequence of Ethicon's act.   This test – a substantial part in bringing about the injury – is to be distinguished from the test you must employ in determining whether Ethicon's actions were motivated by discrimination.   In other words, even assuming that Ethicon's actions were motivated by discrimination, Ms. Ellis is not entitled to damages for an injury unless Ethicon's discriminatory actions actually played a substantial part in bringing about that injury.
>
> . . .
>
> [I]n awarding emotional distress damages, you are not to award damages for the mount of wages that Ms. Ellis would have earned either in the past or in the future if she had continued in employment with Ethicon.   These elements of recovery of wages that Ms. Ellis would have received from Ethicon are called "back pay" and "front pay."   Back pay and front pay are to be awarded separately . . . .

May 19 Tr., 30 (emphasis added).   Based upon this instruction, the jury found that Ellis had not proved by a preponderance of the evidence that Ethicon "played a substantial part" in causing Ellis to suffer emotional distress.   However, notwithstanding that

determination, the jury did find that Ethicon was "a cause" of Ellis' short-term disability at Aventis and her disability which resulted in her leaving Aventis in August of 2004. Atlantic & Gulf Stevedores, Inc., v. Ellerman Lines, Ltd., 369 U.S. 355, 364 (1962)("where the special verdict answers appear to be inconsistent but "there is a view of the case that makes the jury's answers . . . consistent, they must be resolved that way").[7]   These two determinations were predicated upon different proofs and are separate and distinct remedies.   Hence, the Court is not bound by the jury's rejection of causation with regard to Ellis' claim of emotional distress in considering back pay.

Nevertheless, Defendant contends that even if the Court were to go beyond the jury's verdict on emotional distress causation, Ellis did not meet her burden of proving that Ethicon caused her inability to continue working at Aventis.   Defendant points out that Ellis testified that she did not ask for accommodations from Aventis because she did not require them.   Also, Defendant urges the Court to reject Dr. Gross' theory that Ellis' inability to continue working at Aventis resulted from her decision, based upon her experience at Ethicon, to not disclose her disability or ask for accommodations for fear that she would be fired.

Citing portions of Ellis' testimony, Defendant points out that Ellis indicated she did not request accommodations from Aventis because she believed she was able to work

---

[7]

Defendant's reliance on Roebuck v. Drexel University, 852 F.2d 715 (3d Cir. 1988), is misplaced.   In Roebuck, the Third Circuit held that the issue of intentional race discrimination is common to both Title VII and § 1981 claims, and hence, the trial court is bound in a Title VII case to conform its verdict to the findings of the jury in a concurrently tried § 1981 case.   Id. at 737-38.   Roebuck's holding does not make the jury's finding regarding emotional distress binding on this Court's determination regarding back pay.

through her disability.   However, the fact remains that Ellis testified she was reluctant to request accommodations from Aventis due to her negative experience at Ethicon when she requested accommodations.  May 7 Tr., 123; May 6 Tr., 13-14.  As such, Ellis utilized the cognitive therapy she had learned to cope with her impairments at a working environment that was different than Ethicon.  Id. at 15.  As Ellis set forth in her testimony, however, the work at Aventis eventually "piled up," and she no longer was able to cope with the working conditions.   May 6 Tr., 16-17.

Additionally, Dr. Gross, Ellis' treating psychiatrist and an expert witness, testified that the termination from Ethicon had a devastating impact on Ellis' work life.  See Gross, 15.  Dr. Gross explained that the reason why Ellis was so determined to work at Aventis immediately after leaving Ethicon was the fact that she valued her career.  Id. at 16-17.  In fact, contrary to the testimony of Dr. Badgio, Defendant's expert, Dr. Gross indicated that Ellis' desire to continue working despite her disability was so strong[8] that she feared disclosing her cognitive impairments to Aventis would prevent her from being hired, or that she would be fired, as an employee. Id. at 19.   However, since Ellis hid her disability from Aventis and worked without any accommodations, she became more depressed, her self-doubts worsened, and ultimately, Ellis was hospitalized.  Id. at 20.  Dr. Gross attributed Ellis' disability – which, in part, caused her to take a short-term disability leave from November 5, 2003 to March 28, 2004, and leave Aventis in August 2004 – to Ellis' experiences surrounding her termination from Ethicon.  Id. at 20-21.

Defendant presents the Court with multiple reasons that may have contributed to

_____

[8]Indeed, Dr. Badgio concurred with this observation by pointing out that Ellis is "a woman who has always relied [a] great deal upon denial. She consistently throws herself into hard work."   Badgio, 77.

Ellis' disability at Aventis and also countered Dr. Gross' observations with its own expert's testimony.   To that extent, Defendant is merely weighing the evidence and suggesting to the Court that the testimony of Dr. Gross and Ellis is not credible.   The Court finds that while Dr. Badgio's testimony tended to contradict Dr. Gross' diagnosis, Ellis has proved by a preponderance of the evidence that her termination from Ethicon was a cause of her disability at Aventis.   In that regard, the Court finds Dr. Gross' explanation sound:

A.  Well, first of all, I know Theresa Ellis very well, psychologically and so forth. Second of all, I've been a psychiatrist for 30 years that deals with issues like this all the time.   You know, patients don't always know where there's something happens in their life how traumatic it will be to them.   Until you point it out to them over a period of time, sometimes they're oblivious to it or they're in denial.   So that it's not unusual for someone not to talk about an issue right away because they're not even aware that it's a serious psychological issue. Sometimes it's subconscious, unconscious . . . .

Q.  Right.   And you were aware of other stressors in Ms. [Ellis'] life; isn't that right?

A.  That's correct.

Q.   And yet despite the stress of financial burdens and marital stress and relationships with her family, you continue to believe that the termination from Ethicon has impacted Ms. Ellis more than those other stressors; is that right?

A.   Oh, absolutely.

Q.   And is that because of its effect on her self-esteem?

A.   Her self-esteem.   It was a slap in the face; it was a failure.   I mean she has ongoing issues financially, has been through some marital issues.   But she's still married; she still able to pay her bills; and yes, [there were] some family issues. You can't compare that to being fired.   The first time in her life, a very intelligent, competent person, who now has been told you can't work in this place anymore; you are not good enough.

Gross, 66-67.   That stress, coupled with her cognitive impairments, eventually led Ellis

to leave Aventis.   See Id. at 19-21.   Indeed, the jury in its advisory verdict, notwithstanding Dr. Badgio's testimony, credited Dr. Gross' testimony and thus, also concluded that Ethicon's conduct was a cause of Ellis' disability at Aventis.   Accordingly, the Court, having weighed the evidence, finds that Ellis' termination from Ethicon was a cause of her disability at Aventis.[3]

### 2.    Mitigation of Damages

Plaintiff's recovery is limited by mitigation principles.   Ellis had a statutory duty to minimize damages by using reasonable diligence to find other suitable employment. 42 U.S.C. § 2000e-5(g); Booker v. Taylor Milk Co., 64 F.3d 860, 864-65 (3d Cir. 1995).

---

[3] Having determined that Ethicon's conduct was a cause of Ellis' disability at Aventis, the Court need not also determine whether an award of back pay must also take into account other causes, much like a personal injury claim involving comparative fault.   The cases cited by Defendant offer little to support its novel legal assertion.   See, e.g., Mckinnon v. Kwong Wah Restaurant, 83 F.3d 498 (1st Cir. 1996)(with respect to "emotional distress," the court found that the defendant must establish a casual relationship between the prior injury and the damages claimed by the plaintiffs); Miles-Hickman v. David Powers Homes, 613 F. Supp. 2d 872, 889 (with respect to the period of back pay, because the court could not conclude plaintiff would have remained employed as a sales assistant in a depressed housing market for than two years after her employment, it did not award back pay for more than two years); Sowers v. Kemira, Inc., 701 F.Supp. 809, 827 (S.D. Ga. 1988)(based upon a reason of speculation regarding causation, the court limited the period for awarding "front pay," not back pay).   Indeed, the Court's independent search of the case law does not reveal any Third Circuit authorities supporting Defendant's position.   Rather, the Third Circuit in Robinson v. SEPTA, 982 F.2d 892, 898 (3d Cir. 1993), opined that back pay damages should not be reduced through a comparative fault-type analysis.   Id.   While Defendant distinguishes Robinson on the basis that the court was dealing with multiple causes for the employer's discriminatory conduct instead of plaintiff's injury, the court's sound reasoning applies in this context.   Indeed, the court predicated its finding upon the notion that "back pay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination."   Id.   Since the Court finds that Ethicon's discriminatory conduct was a cause of Ellis' disability at Aventis, an award of back pay in this case compensates Ellis for the effect of Ethicon's past conduct.   Accordingly, the Court finds Defendant's argument regarding proximate cause without merit.

In the context of a Title VII claim, the Supreme Court has held:

> An unemployed or underemployed claimant, like all other Title VII claimants, is subject to the statutory duty to minimize damages set out in [42 U.S.C. § 2000e-5(g)]. This duty, rooted in an ancient principle of law, requires the claimant to use reasonable diligence in finding other suitable employment. Although the unemployed or underemployed claimant need not go into another line of work, accept a demotion, or take a demeaning position, he forfeits his right to backpay if he refuses a job substantially equivalent to the one he was denied.

Ford Motor Co. v. EEOC, 458 U.S. 219, 231-32 (1982) (footnotes and internal citations omitted).   "While it is the duty of a discrimination claimant to mitigate her losses, it is the employer who has the burden of proving a failure to mitigate." Caufield v. Center Area School Dist., 133 Fed. Appx 4, 10-11 (3d Cir. 2005); see Robinson v. Southeastern Pa. Transp. Auth., Red Arrow Div., 982 F.2d 892, 897 (3d Cir. 1993); Goss v. Exxon Office Systems Co., 747 F.2d 885, 889 (3d Cir. 1984).   To prove a failure to mitigate, Ethicon had to prove either that other substantially equivalent positions were available to Ellis and she failed to use reasonable diligence in attempting to secure those positions, or, alternatively, that Ellis withdrew entirely from the employment market. Tubari, Ltd., Inc. v. NLRB, 959 F.2d 451, 454 (3d Cir. 1992).   "When an employer successfully proves a failure to mitigate, any back-pay award to an aggrieved employee will be cut off or reduced beginning at the time of the employee's failure to mitigate and any front-pay award will be foreclosed." Caulfield, 133 Fed. Appx at 11 (citing Ford Motor Co., 458 U.S. at 233-34).

The jury found that Ellis failed to mitigate her damages by failing to find suitable employment after she left Aventis.   Indeed, Ellis' testimony shows that she made no attempt to return to work at Aventis or seek any other employment.   See May 6 Tr.,

147-48.

> Q.   Have you tried to go back to work at Aventis?
>
> A.   No.
>
> Q.   Have you made any inquiries about going back to work at Aventis?
>
> A.   No.
>
> Q.   Since you left Aventis, have you tried to get a job at another company?
>
> A.   No.
>
> Q.   Have you made any attempts to search for employment since you left Aventis?
>
> A.   Outside of just scanning for jobs, no.
>
> Q.   Have you sent letters, resumes –
>
> A.   No.
>
> Q.   -anything to anybody to try to get a job since you left Aventis?
>
> A.   No, no networking.

Id.  Although Ellis' efforts to secure new employment need not be successful, she must exercise good faith in attempting to secure a position.  Caufield, 133 Fed. Appx. at 12. Her only explanation for not re-entering the workplace was the pendency of this lawsuit. In that regard, Ellis testified that, through this litigation, she was seeking reinstatement as she believed her best chance for success was to return to Ethicon with reasonable accommodations.  Ellis reasoned that because Ethicon is aware of her disability, she would not have to deal with the emotional issues resulting from disclosing her disability to a new employer.  However, if the Court were to accept such argument, then every plaintiff in an employment discrimination suit would be able to satisfy his/her statutory

obligation to mitigate by claiming that his/her former employment presents the optimal opportunity for success; such result is contrary to the purpose of the statute.  See McKnight v. General Motors Corp., 973 F.2d 1366, 1372 (7th Cir. 1992)(a plaintiff "[cannot] just leave the labor force after being discharged, in the hope of someday being made whole by a judgment at law").   Plaintiff does little to oppose this issue.

Instead, Plaintiff incorrectly focuses on Defendant's failure to prove that substantially equivalent work was available.   Once Defendant meets its burden on the mitigation issue by showing that Ellis withdrew from the job market search, Ethicon does not also have to establish the availability of substantially equivalent employment. West v. Nabors Drilling USA, Inc., 330 F.3d 379, 393 (5th Cir. 2003).   The West court elucidated:

> The burden is on the employer to prove failure to mitigate.   Although the employer is normally required to prove that substantially equivalent work was available and that the former employee did not exercise reasonable diligence to obtain it, once the employer proves that an employee has not made reasonable efforts to obtain work, the employer does not also have to establish the availability of substantially equivalent employment.   A plaintiff may not simply abandon his job search and continue to recover back pay.

Id.(citations and quotations omitted).   While the Third Circuit has not had the occasion to formally address this issue, it has implicitly acknowledged such a result when it advised that showing of comparable positions is not required when the plaintiff has withdrawn from the job market.   Caufield v. Center Area School Dist., 133 Fed. Appx 4, 10-11 (3d Cir. 2005)(addressing back pay under the ADEA, the court held that "[t]o prove a failure to mitigate, [defendant-appellee] had to prove either that other substantially equivalent positions were available to Appellant and she failed to use reasonable

diligence in attempting to secure those positions, or, alternatively, that Appellant withdrew entirely from the employment market" (quotations and citations omitted)) (emphasis added); see also Tubari, Ltd., Inc. v. NLRB, 959 F.2d 451, 454 (3d Cir. 1992). [9] In light of the foregoing principles, Plaintiff has failed to advance any persuasive legal argument, or point to any cogent evidence presented at trial, that would prove that she reasonably sought employment after leaving Aventis and thus, Defendant has satisfied its burden of showing Plaintiff failed to mitigate after leaving her employment at Aventis in August 2004.   The Court, therefore, takes into account Plaintiff's failure to mitigate when fashioning an award of back pay.

### B.   Calculation of Back Pay

The starting point in the calculation is determining the period of back pay. Under the law, back pay encompasses the period between the date of Ellis' termination from Ethicon to the date of the judgment.   The beginning of the back pay period is the date on which Ellis was terminated from Ethicon, i.e., October 22, 2001.   Since Ellis' employment at Aventis began on December 17, 2001, she was unemployed from October, 22 2001 to December 16, 2001.   Defendant argues that Ellis is not entitled to any back pay during this period because she chose to forego another comparable position at Aventis offered to her two days after Ellis was terminated from Ethicon.   However, in light of the Third Circuit decision in Donlin, the Court previously rejected this argument. The Court reasoned that Defendant has not proved that the position of statistician at Aventis was "substantially comparable" to Ellis' position as a quality engineer at Ethicon.

---

[9] While Tubari applied mitigation principles under the NLRB rather than the ADA, the rule announced there is also utilized in employment discrimination cases. See, e.g., Booker, 64 F.3d at 865 (Title VII).

Therefore, she was not required to accept such a position.  See Donlin, 564 F.3d at 222-23 ("only unjustified refusals to find or accept other employment are penalized"). Accordingly, the Court will include this period of unemployment when calculating back pay.

Next, the back pay period will also include the period when Ellis began working at Aventis until she left Aventis because of her disability, i.e., December 17, 2001 to August 4, 2004.   However, Ellis' earnings at Aventis must be subtracted from the award of back pay.  The Court notes that in Defendant's proposed calculation, Ethicon excluded the period of Ellis' short-term disability at Aventis from November 5, 2003 to March 28, 2004, because Defendant argues that Ellis' subsequent disability at Aventis cannot be attributed to Ethicon's conduct.  However, since the parties stipulated to the earnings Ellis made at Aventis during the relevant years in their Pre-Trial Order, and those earnings are more than what she would have made at Ethicon[4], the effect of the short-term disability period on the award of back pay is moot.

Finally, the Court must determine the end date of the back pay period.   To begin, the Court credits Ellis' testimony with regard to her treatment at the Nevada Community Enrichment Program for approximately two-and-a-half months after leaving Aventis. See May 2, Tr., 27-28.   In that regard, the Court finds that Ellis was not able to work for the period she was receiving treatment at the facility.[5]  Notwithstanding this finding, Ellis simply has failed to present to the Court any evidence that would demonstrate that

---

[4] See chart below.
[5] Because the Court has found, in this Opinion, that Ellis is capable of working with accommodations, notwithstanding the fact she left Aventis on disability and never returned to work, Plaintiff has not put forth any evidence demonstrating her inability to work after leaving Aventis, except for the two-and-a-half months of treatment.

Ellis was incapable of working with or without accommodations after her treatment in Nevada.   In fact, both of Plaintiff's experts did not opine on whether Ellis was capable of working immediately after leaving Aventis.   Instead, on the issue of Plaintiff's ability to work, Dr. Gross testified that Ellis should be reinstated to her position at Ethicon.   See Gross, 21-22.   Similarly, Dr. Watson did not treat Ellis in 2004 when Ellis left Aventis, and therefore, she has no opinion as to Ellis' working capabilities at that time.   Indeed, Plaintiff did not consult with Dr. Watson again until 2007, at the time this case was nearing trial in this Court.   Moreover, while Ellis and her husband testified in general as to Ellis' cognitive impairments and how those impairments affected her daily living, neither Ellis nor her husband testified specifically about her inability to work after leaving Aventis.   Instead, Ellis stated that she is capable of working and that returning to Ethicon would be the best opportunity for her to succeed.   Thus, the Court finds that Ellis has failed to prove that she was incapable of working after her treatment in Nevada.

In addition, the Court has already found that Ellis failed to mitigate her damages by not making any reasonable efforts to secure employment after she left Aventis.   In that regard, Ellis is not entitled to any back pay after her treatment.   Accordingly, the appropriate back pay period is from October 22, 2001 -- the date she was terminated from Ethicon -- to December 20, 2004 – the date she was able to work after leaving Aventis (including the two-and-a-half month period of treatment) -- less her earnings from Aventis.

Next, the Court must determine what Ellis' yearly salary would have been at Ethicon from 2001 to 2004, including any raises or bonuses.   However, because Plaintiff did not produce any evidence at trial with respect to bonuses or fringe benefits

that she would have received had she stayed at Ethicon, the Court will not speculate as to the amount of these benefits, and thus, will not consider them in calculating back pay.

Plaintiff offered the expert testimony of Dr. Gamboa, a vocational expert on damages, to support her claim of back pay.  Dr. Gamboa testified that Ellis' total economic loss (past and future), which included a reduction for taxes, both federal and state taxes, is $1,769,000.  See Gamboa, 22.  The starting point for Dr. Gamboa's conclusion is determining Ellis' present value salary.  Dr. Gamboa used $82,540 -- which is inaccurate -- as Ellis' salary when she left Ethicon and, without an explanation, testified that Ellis' present value salary in 2007 was $98,907.[6]  Id. at 19.  Dr. Gamboa then multiplied that figure by Ellis' worklife expectancy of 19 years and subtracted from that number $200,000, which represents Ellis' earnings from Aventis, and any federal and state taxes.  Dr. Gamboa concluded that Ellis' total economic loss is approximately $1.7 million.  However, in light of the findings made in this Opinion, the Court holds that, in many respects, Dr. Gamboa's simplistic calculations are neither helpful nor reliable.

First, the Court finds Dr. Gamboa's calculation of present value unreliable because he converted the wrong yearly salary for Ellis at Ethicon in 2001.[7]  Moreover, his present value calculation only accounted up to the year 2007.  Most significantly, Dr. Gamboa did not explain how he arrived at any of the figures.  In particular, he provided no explanation of his methodology, calculations, or assumptions, except that he assumed

[6] Before trial, Plaintiff submitted a report by Dr. Gamboa.  However, because that report was never introduced at trial, the Court will not rely on the report.  The Court will only rely on Dr. Gamboa's video-taped testimony.
[7] Dr. Gamboa used $82,540 as Ellis' yearly salary when she left Ethicon in 2001; however, her salary was $86,900.

that Ethicon caused Plaintiff's disability at Aventis and caused her to be subsequently unable to work and he assumed a worklife expectancy of 19 years (from 2001 to 2020, when Plaintiff will be age 55).   Furthermore, while Dr. Gamboa increased the basis of Plaintiff's Ethicon earnings to 2007 dollars, he subtracted Aventis earnings in 2002-2004 dollars; this appears to be an inconsistent approach.   In light of these deficiencies, the Court is unable to rely on Dr. Gamboa's calculation when considering Plaintiff's back pay.   Likewise, the Court rejects the jury's advisory verdict on the amount of back pay because the jury's determination appears to have been based upon Dr. Gamboa's unreliable testimony.   More importantly, it appears that the jury's recommendation did not take into account Ellis' failure to mitigate her damages – even though the jury had found that Ellis failed to mitigate.   See Jury Verdict (What is the dollar amount of the wages that Ms. Ellis lost by her termination from Ethicon between October 22, 2001 and today caused by Ethicon?).   The Court will undertake an independent appraisal of Ellis' back pay.

Without any reliable evidence as to Ellis' salary, raise or fringe benefits, the Court resorts to using Ellis' Ethicon salary in 2001 as a starting point when calculating her back pay.   Consequently, the Court will subtract Ellis' hypothetical Ethicon salary from her earnings at Aventis during the relevant years.   The following chart represents the back pay to which Ellis is entitled:

| Time Period | Hypoth. Ethicon Earnings | Aventis Earnings[8] | Back Pay Entitled |
|---|---|---|---|
| 10/22/01- 12/16/01 (8 weeks) | $13,369 | 0 | $13,369 |
| 12/17/01 – 12/31/01 (2 weeks) | $3,342 | $3,020 | $322 |
| 2002 | $86,900 | $76,295 | $10,605 |
| 2003 | $86,900 | $92,822 | 0 |
| 1/1/04-8/4/04 (33 weeks) | $55,148 | $76,217 | 0 |
| 8/5/04 – 10/20/04 (appx. 2.5 months) | $18,104 | 0 | $18,104 |
| Total | | | $42,400 |

The Court finds that $42,400 is the appropriate back pay; however, the back pay amount must be awarded in the present value of 2009. Because Plaintiff did not offer the Court sufficient evidence to calculate that figure, the Court will allow Plaintiff to submit a declaration from an expert to furnish the appropriate calculation. Defendant shall have leave to file a response.

## C.      Federal Income Tax Consequences

Ellis requests the Court to increase any back pay award to offset the negative tax consequences of a back pay award. The Supreme Court has held that a back pay award under discrimination statutes is taxable in the year that it is paid. See Comm'r of Internal Revenue v. Schleier, 515 U.S. 323 (1995); Eshelman, 554 F.3d at 441; Robinson v. Se. Pa. Transp. Auth., 982 F.2d 892, 898 (3d Cir. 1993). In light of that tax scheme, the Third Circuit has explained that "employees may be subject to higher taxes if they receive a lump sum back pay award in a given year." Eshelman, 554 F.3d at 441. In other words, receipt of a lump sum back pay award could elevate an employee into a

---

[8] The parties stipulated to the earnings Ellis made at Aventis during the relevant years. See Final Pre-Trial Order.

higher tax bracket for that year.  As a result, the employee would have a greater tax burden than if she were to have received that same pay in the normal course.  This is the basis of Ellis' request to receive an additional sum of money to compensate for her added tax burden.

The Third Circuit has held that a district court may, pursuant to its broad equitable powers granted by the ADA, award a prevailing employee an additional sum of money to compensate for the increased tax burden a back pay award may create.  In re Continental Airlines, 125 F.3d 120, 135 (3d Cir. 1997).  Without this type of equitable relief in appropriate cases, it would not be possible "to restore the employee to the economic status quo that would exist but for the employer's conduct."  Id.  In that regard, the Third Circuit recently declared:

> [A]n award to compensate a prevailing employee for her increased tax burden as a result of a lump sum award will, in the appropriate case, help to make a victim whole. This type of an award, as with prejudgment interest, represents a recognition that the harm to a prevailing employee's pecuniary interest may be broader in scope than just a loss of back pay. Accordingly, either or both types of equitable relief may be necessary to achieve complete restoration of the prevailing employee's economic status quo and to assure "the most complete relief possible." Local 28 of Sheet Metal Workers' Int'l Ass'n v. E.E.O.C., 478 U.S. 421, 465 (1986); see also Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843, 850-54 (2001) (recognizing "front pay" as an equitable remedy authorized under Title VII); Franks v. Bowman Transp. Co., 424 U.S. 747, 766 (1976)("It can hardly be questioned that ordinarily [the equitable relief of restoration of seniority] will be necessary to achieve the 'make whole' purposes of [Title VII]").

Eshelman, 554 F.3d at 442.  However, in so holding, the court cautioned that "a prevailing plaintiff in discrimination cases is [not] presumptively entitled to an additional award to offset tax consequences above the amount to which she would

otherwise be entitled.   Employees will continue to bear the burden to show the extent of the injury they have suffered." Id. at 443.   Accordingly, district courts, in using their wide discretion to locate a just result, "should grant relief in light of the circumstances peculiar to the case." Id. (citations and quotations omitted).

The Court is inclined to award Plaintiff an additional sum of money to offset negative federal tax consequences.   This conclusion follows the reasoning in Eshelman. In Eshelman, 554 F.3d at 440, a jury found that the defendant, the plaintiff's former employer, had discriminated against her in terminating her employment. The jury awarded the plaintiff back pay, to which the district court then added a sum of money to compensate for the negative tax consequences of a lump sum back pay award. Id.   The Third Circuit subsequently affirmed the district court's decision.   Here, a jury has found that Ethicon did in fact terminate Ellis in violation of the ADA.   Adhering to the remedial goals of the ADA, Ellis, being the prevailing party, is entitled to this type of award in order to restore her economic status quo to that where would have existed but for Ethicon's conduct.   However, before assessing the amount of the award, Plaintiff must provide the Court with additional financial analysis and evidence with regard to her tax burden for the relevant years in order to avoid speculation.   Argue v. David Davis Enters., No. 02-9521, 2009 U.S. Dist. LEXIS 32585, at *77 (E.D. Pa. 2009)(determinations with respect to negative federal tax consequences must properly be grounded in facts of the case).

### D.    Prejudgment Interest

In the Third Circuit, there is "a strong presumption in favor of awarding prejudgment interest, except where the award would result in 'unusual inequities.'"

Booker, 64 F.3d at 868.   Prejudgment interest "serves to compensate a plaintiff for the loss of the use of money that the plaintiff otherwise would have earned had [s]he not been unjustly discharged."   Booker, 64 F.3d at 868; see also Arco Pipeline Co. v. SS Trade Star, 693 F.2d 280, 281 (3d Cir. 1982) ("The purpose of prejudgment interest is to reimburse the claimant for the loss of the use of its investment or its funds from the time of the loss until judgment is entered.").   "As with the back pay award, prejudgment interest helps to make victims of discrimination whole."   Booker, 64 F.3d at 868; Eschelman, 554 F.3d at 442 (Prejudgment interest is now universally accepted form of equitable relief).

However, the Court must decide the applicable interest rate.   Loesch v. City of Philadelphia, No. 05-578, 2008 U.S. Dist. LEXIS 48757, at *8 (E.D. Pa. Jun. 19, 2008)("If a court decides to award prejudgment interest to the requesting party, the applicable prejudgment interest rate is left to the sound discretion of the Court" (citations and quotations omitted)).   The parties dispute which applicable rate applies. Plaintiff urges the Court to employ the IRS overpayment rates under 28 U.S.C. § 6621(a)(1), while Defendant suggests the Court utilize the statutory post-judgment interest rate under 28 U.S.C. § 1961.   As the parties point out, the Third Circuit has approved the use of both types of rates, see Sun Chip, Inc. v. Matson Navigation Co., 785 F.2d 59, 63 (3d Cir. 1986) and Taxman v. Bd. of Educ. of Tp. Of Piscataway, 91 F.3d 1547, 1566 (3d Cir. 1996), and district courts in this circuit have not favored one type of rate over the other.   In making this determination, the Court is persuaded by other district courts that have found the IRS overpayment rate appropriate.   See Taylor v. Cent. Pa. Drug and Alcohol Servs. Corp., 890 F. Supp. 360, 368-69 (M.D. Pa. 1995); Pignataro v.

Port Auth., No. 04-1767, 2008 U.S. Dist. LEXIS 61398, at *12 (D.N.J. Aug. 11, 2008). The "[Internal Revenue Service ("IRS")] overpayment rates, 26 U.S.C. § 6621(a)(1)," is "the most logically consistent with the purpose for awarding prejudgment interest, i.e., to place the plaintiff in the position [she] would have been in had [she] not been unlawfully deprived of [her] salary." Taylor, 890 F. Supp. at 369 (noting that several other courts in the Third Circuit have adopted IRS interest rate calculation under the same rationale). The Taylor court noted that using the IRS overpayment rates is sound because the National Labor Relations Board, consistent with congressional intent, calculates prejudgment interest on back pay awards using the IRS overpayment rate, and the NLRA's remedies serve as a blueprint for fashioning remedies under Title VII. Id. Accordingly, the Court adopts the approach set forth in 26 U.S.C. § 6621(a)(1), and pursuant to IRS Revenue Ruling 2009-27, the interest rate is 4% for fourth quarter of 2009.[9]  In that connection, the parties shall calculate, and submit to the Court, the appropriate prejudgment interest employing 4% as the interest rate.

### III.    Front Pay or Reinstatement

Rather than an award of front pay, Plaintiff seeks reinstatement of her position as a quality engineer at Ethicon. See Plaintiff's Brief in Support of Motion at p.12. Reinstatement is the preferred remedy to avoid future lost earnings. Maxfield v. Sinclair Int'l, 766 F.2d 788, 796 (3d Cir. 1985); Starceski v. Westinghouse Electric Corp., 54 F.3d

---

[9]As a final note, the Court rejects Defendant's argument that the pre-judgment interest should not include periods covered by the trial adjournments that Plaintiff requested. Adjournments are a part of the trial practice, and the Court does not find any reason to parse through the pre-trial phases to determine which party, or the Court's schedule, resulted in delay; it is the reality and risk of litigation.

1089, 1103 (3d Cir. 1995).   It is an obvious form of relief to make the plaintiff whole and to relieve the plaintiff of the effects of discrimination.   <u>Ellis v. Ringgold School Dist.</u>, 832 F.2d 27, 30 (3d Cir. 1987).   However, reinstatement may not be feasible in all cases. <u>Goldstein v. Manhattan Industries, Inc.</u>, 758 F.2d 1435, 1438-49 (3d Cir. 1985).   For instance, there may be no position available at the time of judgment or the relationship between the parties may have been so damaged by animosity that reinstatement is impracticable.   <u>Maxfield</u>, 766 F.2d at 796; <u>see</u> <u>Donlin</u> 564 F.3d at 220; <u>Whittlesey v. Union Carbide Corp.</u>, 742 F.2d 724, 728 (2d Cir. 1984); <u>Cancellier v. Federated Department Stores</u>, 672 F.2d 1312, 1319 (9th Cir.), <u>cert.</u> <u>denied</u>, 459 U.S. 859, (1982). In such circumstances, "the remedial purpose of the statute would be thwarted and plaintiff would suffer irreparable harm if front pay were not available as an alternate remedy to reinstatement." <u>Whittlesey</u>, 742 F.2d at 728.

Since reinstatement is an equitable remedy, it is within the district court's discretion whether reinstatement is feasible.   <u>Maxfield</u>, 766 F.3d at 796; <u>Ellis</u>, 832 F.2d at 30; <u>see</u> <u>also</u> <u>Garza v. Brownsville Independent Sch. Dist.</u>, 700 F.2d 253 (5th Cir. 1983); <u>Protos v. Volkswagen of America, Inc.</u>, 797 F.2d 129 (3d Cir.) (court ordered reinstatement as remedy for violation of Title VII by employer who failed to reasonably accommodate plaintiff's religious practices), <u>cert.</u> <u>denied</u>, 479 U.S. 972 (1986).

As a preliminary matter, Defendant suggests that if the Court were to find that Plaintiff failed to mitigate her damages, which the Court has found, reinstatement should be foreclosed.   The Court disagrees.   While an award of front pay may be foreclosed or reduced by a plaintiff's failure to mitigate, reinstatement is not.   The Third Circuit has not had the occasion to visit this issue; however, the Court finds the Tenth Circuit's

reasoning persuasive in <u>Dilley v. SuperValu, Inc.</u> 296 F.3d 958, 967 (10th Cir. 2002).

See <u>Id.</u>(failure to mitigate does not bear on a plaintiff's entitlement to reinstatement).

Indeed, mitigation is relevant to determining a plaintiff's entitlement to back pay and

front pay, but "there is no logical link between a plaintiff's pursuit of alternative

employment and whether he should be reinstated to the position from which he was

wrongfully discharged."  <u>Id.</u>  The <u>Dilley</u> court explained:

> A plaintiff's ability to replace some of the income lost by virtue of the wrongful discharge certainly affects how much lost income he is due, but it does not bear on whether the plaintiff is entitled to the job itself. This is reflected in the reality that courts routinely find that a plaintiff's failure to mitigate negates or reduces his claim for back pay or front pay, but nevertheless analyze his claim for reinstatement without even referencing the mitigation finding. <u>See Hazel v. United States Postmaster Gen.</u>, 7 F.3d 1, 5 (1st Cir. 1993); <u>Reneau v. Wayne Griffin & Sons, Inc.</u>, 945 F.2d 869, 870 (5th Cir. 1991); <u>Hansard v. Pepsi-Cola Metro. Bottling Co.</u>, 865 F.2d 1461, 1470 (5th Cir. 1989)("If the district court finds on remand that [the plaintiff] cannot be reinstated, the court must consider his failure to mitigate his damages in determining the extent to which, if at all, front pay is appropriate."). The district court's reasoning also runs counter to those cases where courts have reduced damages based on a failure to mitigate even where reinstatement has been ordered. <u>See, e.g., Brady v. Thurston Motor Lines, Inc.</u>, 753 F.2d 1269, 1271, 1280 (4th Cir. 1985); <u>Alicea Rosado v. Garcia Santiago</u>, 562 F.2d 114, 117, 120 (1st Cir. 1977).

<u>Dilley</u>, 296 F.3d at 967.   Accordingly, the Court will consider reinstatement despite the

fact that the Court has found Plaintiff failed to mitigate her damages after leaving

Aventis.

To that end, the Court finds that reinstatement is the most appropriate remedy

under the circumstances of this case.  Arguing the contrary, Defendant asserts that

Plaintiff has not established that she is able to work at this point in time.  The Court

disagrees.  Although advisory in nature, the jury found that Ellis is currently able to

work with or without accommodations.   This finding is based upon the testimony from Dr. Gross.   Dr. Gross opined that the emotional stress Ellis was experiencing at Aventis stemmed from Ethicon's termination due to her disability, which dealt a severe blow to her self-esteem.   Consequently, she was afraid of disclosing her disability to Aventis, and indeed, worked at Aventis without any accommodations.   Eventually, Ellis was unable to "keep up with it psychologically and cognitively."   Gross, 20.   In that regard, it was Dr. Gross' opinion that reemployment at Ethicon would provide Ellis the best opportunity to work again.   He reasoned that Ellis would not have to deal with the disclosure issues regarding her disability.   Id. at 64.   Further, Dr Gross testified:

> Q.     Okay.   Now, looking at Theresa Ellis today, do you have an opinion as to the psychological impact if Ethicon were ordered to reinstate her with reasonable accommodations?
>
> A.     I think this would be a beneficial thing for her emotionally.   She wants to work; she would – she'd love to go back to Ethicon where this – that she loved, the job that she loved.   It's sort of like someone falling off a horse and getting back on the horse, and so they feel that they're okay again.   This would be a benefit to her.
>
> . . .
>
> A. Certainly that my recommendation would be for [Ellis] to try to return to work, at the right job and kind of in the right way in terms of accommodations initially.

Gross, 21-22.   In response to Dr. Gross' testimony, Defendant claims that because Dr. Gross certified Ellis' Social Security disability benefits, he believed Ellis cannot work. Such argument is misplaced because social security benefits do not take into account the

possibility of reasonable accommodation.   See Lujan v. Pacific Maritime Ass'n, 165 F.3d 738, 740 (9th Cir. 1999)("it is possible, due to the different definitions of disability employed by various agencies, to qualify for disability benefits and to satisfy the ADA's definition of a qualified person with a disability.   Therefore, an individual's statements that [s]he is disabled or totally disabled for purposes of disability benefits are not necessarily inconsistent with [her] representations that [she] is a 'qualified individual with a disability" (quotations and citations omitted)); see also Motley v. New Jersey State Police, 196 F.3d 160, 164 (3d Cir. 1999)("there are situations in which a person may be disabled enough to qualify for receipt of disability benefits under SSDI, yet still be able to bring a cognizable ADA claim.   In large part, this is because, when determining whether to award SSDI benefits, the possibility of reasonable accommodation is not taken into account. Under the ADA, however, a 'qualified individual' includes all people who 'can perform the essential functions' of the job 'with or without reasonable accommodation.'" (citations omitted)).

Defendant next contends that Plaintiff's own theory for obtaining relief after August 2004 should be sufficient for the Court to find reinstatement inappropriate.   In particular, Defendant cites Plaintiff's own testimony regarding the devastating emotional and psychological impact on her which resulted from Ethicon's termination.   In that connection, Defendant reasons that because Ellis' response to Ethicon was so adverse, it would be difficult to conceive of how she could be returned to the same environment. The Court finds this argument unconvincing.   Indeed, while the evidence presented at trial supports the finding that Ellis' emotional devastation partly resulted from being terminated from Ethicon, none of the testimony established the fact that Ellis worked in

an adverse environment at Ethicon.   In fact, to the contrary, Ms. Traver highly regarded Ellis.   She testified that "up until the time [Ellis] went out on disability, her performance was always exemplary, I would say.   She was a very solid performer, well-regarded, well-respected, and so there weren't specific performance issues."   May 11 Tr., 120-121. As it was already pointed out in this Opinion, Ms. Traver expressed that she was willing to accommodate Ellis to the extent Ellis' proposed accommodations were not permanent.   The Court also rejects Defendant's contention that there is no comparable position available within Ethicon.   There is simply no evidence in the record that would suggest to the Court that Ellis' prior position, quality engineer, or a comparable position, is not currently available at Ethicon.   For these reasons, the Court finds reinstatement is proper, and accordingly, front pay will not be awarded.

### CONCLUSION

For the reasons set forth above, Defendant's motion is DENIED and Plaintiff's motion is DENIED.   The Court shall award Plaintiff back pay in the amount of $42,400, however, this amount must be awarded in the present value of 2009, and also reinstate Ellis' employment at Ethicon as a quality engineer, or a comparable position. Additionally, Plaintiff shall submit her request for attorney's fees and costs and additional calculations consistent with this Opinion, i.e., present value of 2009, prejudgment interest and negative federal tax consequences, no later than twenty days from the date of the Order accompanying this Opinion.   Defendant shall respond no later than ten days from the filing date of Plaintiff's submissions.

An appropriate Order shall follow.

DATED:   November 13, 2009

                                           /s/ Freda L. Wolfson
                                           The Hon. Freda. L. Wolfson
                                           United States District Judge